Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/03/2018 09:09 AM CDT

State of Nebraska, appellee, v.
Desiderio C. Hernandez, appellant.
___ N.W.2d ___

Filed May 11, 2018.    No. S-17-235.

1. **Constitutional Law: Self-Incrimination: Appeal and Error.** Whether a defendant voluntarily made a statement while in custody and whether a defendant unambiguously invoked his or her right to remain silent or to have counsel present are mixed questions of law and fact. An appellate court reviews a trial court's finding of historical facts for clear error and independently determines whether those facts satisfy the constitutional standards.

2. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

3. **Motions for Mistrial: Appeal and Error.** Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

4. **Criminal Law: Motions for Mistrial: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

5. **Constitutional Law: Witnesses: Self-Incrimination.** The 5th Amendment to the U.S. Constitution—applicable to state governments by incorporation through the 14th Amendment—protects against compelled self-incrimination by providing that no person shall be compelled in any criminal case to be a witness against himself or herself.

6. **Motions to Suppress: Self-Incrimination: Proof.** To overcome a motion to suppress, the prosecution has the burden to prove by a preponderance of the evidence that incriminating statements by the accused were voluntarily given and not the product of coercion.

7. **Confessions: Police Officers and Sheriffs.** In determining whether an accused's statement was given freely and voluntarily, courts examine police conduct in light of the totality of the circumstances.

8. ____: ____. Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.

9. **Miranda Rights: Waiver: Words and Phrases.** To be a valid waiver of *Miranda* rights, the waiver must be knowing and voluntary. A waiver is knowing if it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. A waiver is voluntary if it is the product of a free and deliberate choice rather than through intimidation, coercion, or deception.

10. **Miranda Rights: Waiver.** An express waiver of a suspect's *Miranda* rights is not required to be made in writing; an oral waiver is sufficient.

11. ____: ____. Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

12. ____: ____. Statements prefaced by equivocal words like "I think," "maybe," or "I believe" generally do not constitute a clear, unambiguous, and unequivocal invocation.

13. **Evidence: Words and Phrases.** To be relevant, evidence must be probative and material. Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence. A fact is material if it is of consequence to the determination of the case.

14. **Rules of Evidence: Words and Phrases.** In the context of Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

15. **Convictions: Other Acts: Appeal and Error.** When considering whether evidence of other acts is unfairly prejudicial, an appellate court considers whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.

16. **Trial: Prosecuting Attorneys: Words and Phrases.** Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

17. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the resulting conviction violates due process.

18. **Trial: Prosecuting Attorneys.** Prosecutors generally may not give their personal opinions on the veracity of a witness or the guilt or innocence of the accused. The principle behind this rule is that the prosecutor's opinion carries with it the imprimatur of the government and may

induce the jury to trust the government's judgement rather than its own view of the evidence.

19. ____: ____. When a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense.

20. **Juries: Prosecuting Attorneys.** Prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities and personal attributes of the victim.

21. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely upon the context of the trial as a whole.

22. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) whether the strength of the evidence supporting the conviction.

Appeal from the District Court for Richardson County: Daniel E. Bryan, Jr., Judge, Retired. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

Heavican, C.J., Cassel, Stacy, and Funke, JJ., and Colborn and Samson, District Judges.

Samson, District Judge.

## I. INTRODUCTION

A confession may not be used in a criminal prosecution if it was obtained through police coercion rather than voluntarily made. The appellant, who was convicted of first degree murder, argues that his confession was not voluntary, because he was still under the influence of the methamphetamine he

smoked the day before. Because we find no police coercion, we conclude it was voluntary.

The appellant also claims that prior to his confession, he did not voluntarily waive his right to remain silent, but instead invoked that right during his interview with law enforcement. After a review of the evidence, we conclude that the appellant understood his rights, yet still agreed to speak with law enforcement. We also find that the appellant's statement that he would "probably stop talking" was not an unequivocal invocation of the right to remain silent. We also conclude that the district court did not abuse its discretion by not redacting some of the statements in the interview.

Finally, we conclude that the prosecuting attorney made several inappropriate comments during his closing arguments. However, the district court did not abuse its discretion by not declaring a mistrial, in part because of the strength of the evidence supporting the convictions.

## II. BACKGROUND

Desiderio "Desi" C. Hernandez was charged with first degree murder (a Class I or IA felony),[1] use of a firearm to commit a felony (a Class IC felony),[2] and possession of a firearm by a prohibited person (a Class ID felony).[3] All of these charges were made in connection with the death of his cousin, Joseph "Joey" A. Debella, Jr. A 5-day jury trial was held. The following evidence was adduced.

### 1. The Brownell House

Debella moved to Falls City, Nebraska, in the summer of 2015. Shortly thereafter, Debella began staying at Jason Brownell's house (the Brownell house). Several other individuals also stayed there or visited frequently, including John Hall, Brett Winters, David McPherson, Jeff Morley, and

---

[1] See Neb. Rev. Stat. § 28-303 (Supp. 2017).

[2] See Neb. Rev. Stat. § 28-1205(1)(c) (Reissue 2016).

[3] See Neb. Rev. Stat. § 28-1206(3)(b) (Reissue 2016).

Hernandez. Debella lived in the basement. All other residents, including Hernandez, slept upstairs.

Evidence suggested that methamphetamine was sold in the house on a daily basis and that everyone in the house was involved in drug sales, including Hernandez and Debella. One house resident testified that Debella was the primary dealer of methamphetamine.

## 2. August 4, 2015

Hall and McPherson testified to the events leading up to the discovery that Debella had been shot. On the evening of August 4, 2015, Hall and McPherson were smoking methamphetamine in Hall's bedroom in the Brownell house when they heard what sounded like a gunshot. According to McPherson, he said to Hall, "'was that a gunshot I just heard?'" to which Hall replied, "'Yeah. They're probably shooting that gun in the basement, again.'"

A few minutes later, Hernandez opened the door to Hall's bedroom and asked if they wanted to go to the basement to smoke. Hall accepted the invitation, but shortly afterward, Hernandez left out the front door.

After Hernandez left, Hall yelled downstairs to Debella. Debella did not answer. Hall then heard "fast" breathing and went downstairs to discover Debella lying on the floor and shaking, with blood coming out of his head and blood on the floor. Hall yelled to McPherson that Debella had been shot and told McPherson to call the 911 emergency dispatch service. McPherson testified that he did not call 911, because it was not his house and he did not want to get involved. Instead, McPherson went to Brownell's workplace to tell Brownell about Debella.

McPherson and Hall testified that they did not hear anyone entering or leaving the house from the time they arrived to the time Hernandez left. Winters arrived at the house around the time that McPherson was leaving.

Hernandez' sister, Esperanza Ogden, also testified as to her recollections of that night. She testified that Hernandez came

to her house at approximately 11:40 p.m. Hernandez gave Ogden a cigarette and said, "'That will probably be the last cigarette I ever give you.'" Hernandez then told Ogden he had shot Debella and indicated he had shot him in the forehead. Hernandez then walked away.

Ogden then called her and Hernandez' brother and sister-in-law, who also lived in Falls City, to tell them what Hernandez had said. Minutes later, Hernandez arrived at their house. When he arrived, the brother and sister-in-law were on the front porch. From the sidewalk, Hernandez said, "'I shot that motherfucker.'" The brother asked why, and Hernandez replied, "'His bitch shouldn't have been late.'" Hernandez also said, "'I told you guys I wasn't fucking around.'" According to the sister-in-law, as Hernandez was walking away, he sarcastically said, "'Somebody should probably call 911. It's been at least ten minutes now.'" The sister-in-law testified that during the time Hernandez was at their house (about a minute), Hernandez was "hopping around" and could not keep still from adrenaline.

After Hernandez left, the sister-in-law called Ogden back and said she was coming to get her so they could go to the Brownell house together.

When Ogden and the sister-in law arrived at the Brownell house, the front door was locked. As they were knocking, McPherson arrived and yelled to Hall to open the door. Soon after, Hall and Winters opened the door, and McPherson left.

Ogden and the sister-in-law entered the house, and they could hear Debella's labored breathing and moaning. Ogden described Debella's breathing as a "death hurl" or "death gurgle." Ogden then went into the basement and found Debella lying face down, with blood around his head. She told the sister-in-law to call 911.

### 3. August 5, 2015

Police responded shortly after the call. At approximately 12:15 a.m. on August 5, 2015, a Falls City Police Department officer, Jonathan Kirkendall, and another officer arrived at the

scene. Hall told the officers that Debella was downstairs. When Kirkendall arrived at Debella's side, Debella was still breathing laboriously, but when Kirkendall attempted to communicate with him, Debella did not respond.

Kirkendall testified that he did not see any signs of struggle in the basement. The officers found some .22-caliber ammunition in the basement and a revolver handgun under some blankets on a futon bed.

Debella was taken by ambulance to a local hospital and then transported by helicopter to a hospital in Lincoln, Nebraska, where he was stabilized and placed in an intensive care unit. He was kept alive with a life support system. About a week later, Debella's mother decided to remove him from life support, after which he died.

At around 10 a.m. on August 5, 2015, Hernandez went to Michael Seager's house in Falls City. Seager was an acquaintance of Hernandez, whom Hernandez had gotten into an altercation with and had not been in contact with for 6 to 8 months.

Hernandez told Seager he had nowhere to go and asked if Seager wanted to "hang out" and smoke methamphetamine. Seager agreed, and the two spent the day together smoking multiple times. At some time during the day, Hernandez asked Seager if he could stay in his house and pay rent. Seager turned him down.

Hernandez then called his cousin, Tiffany Gates, who lived in Horton, Kansas, which is approximately 35 minutes outside of Falls City. Hernandez told Gates that he needed a place to stay. At the time Hernandez called, Gates already knew Hernandez was wanted in connection with the shooting of Debella and told Hernandez that he could come stay with her. Gates then got her children out of the house and arranged for someone to call the police when she sent a text message indicating that Hernandez had arrived.

Seager drove Hernandez to Gates' house. When they arrived, Gates sent the text message. Gates testified that she asked Hernandez what happened and that he chuckled and said, "'I

got that motherfucker right there.'" Seager testified that he overheard Hernandez say to Gates, "'He was breathing when I got there. He wasn't when I left,'" and he saw Hernandez make a gesture like a gun pointed at his forehead. However, Gates testified that Hernandez told her Debella was still breathing when he left.

At about 7 p.m. on August 5, 2015, Horton police approached the Gates' residence. Hernandez immediately said to Gates, "'I'm not here'" and ran into the house. Gates told one of the officers that Hernandez was inside.

Hernandez was ordered to come out of the house, but he stayed inside. The officers did not enter the house.

### 4. August 6, 2015

After an 8-hour standoff, which included a "SWAT team," Hernandez was taken into custody at approximately 3 a.m. on August 6, 2015. A Taser was deployed on Hernandez during his arrest.

After being briefly treated at a local hospital for a small laceration on his head and for a Taser prong stuck in his chest, Hernandez was medically cleared, turned over to the police, and transported to jail at around 3:30 a.m. on August 6, 2015.

### 5. Interview With Investigators

At around 2:30 p.m. on August 6, 2015, Hernandez was interviewed by two Nebraska State Patrol investigators, Cory Townsend and Nicholas Frederick, in an interview room at the Brown County sheriff's office in Hiawatha, Kansas.

At the beginning of the video-recorded interview, Townsend introduced himself and Frederick and told Hernandez that they were from the Nebraska State Patrol. Hernandez asked Townsend, "Why am I in Kansas, and you guys are questioning me in another state?" Townsend explained that they can question people in other states, but do not have authority to make arrests there.

Townsend told Hernandez that they had an idea about what happened between him and "Joey." Hernandez said,

"Joey who?" Townsend said, "Joey [Debella,] your cousin." Hernandez said, "What about my cousin?" Townsend said, "Tell me your name, please." Hernandez said, "My name is Desi. You just got my name from in there, didn't you?"

Hernandez then launched into a long discussion of his family and various topics. After a while, Townsend told Hernandez again that he wanted to talk to him about Debella and that he needed Hernandez' cooperation to get his side of the story. Hernandez said, "There's nothing I can tell you guys that can help me any more than if I tell you the truth."

Townsend told Hernandez that he needed to make sure Hernandez knew what his rights were. Hernandez responded, "I don't even know what my rights are." As Townsend tried to proceed with reading Hernandez his rights, Hernandez interjected and started talking about various off-topic subjects.

Townsend tried to bring Hernandez back on topic and read from a *Miranda* rights advisory form. He read, "Before asking you any questions about the shooting of Joseph Anthony Debella Jr., I must advise you and you must understand each of the following," and he read the *Miranda* rights. He then said, "Now [Hernandez], did you understand those?" Hernandez said, "Yeah, I'm still focusing on the shooting." Townsend said, "Do you want me to explain or to repeat any of that?" Hernandez shook his head "no."

Townsend then read the bottom of the form, which stated that Hernandez had been advised of his rights and was willing to answer questions. He told Hernandez that there are two sides to every story and that Townsend wanted to get Hernandez' side of the story. Pointing to the line on the rights advisory form that read "the shooting of Joseph Anthony Debella, Jr.," Hernandez said, "That right there is . . . somebody's mistake somewhere." He said he heard that "something happened at that house," but that no one told him what happened. He then asked Townsend to tell him.

Hernandez started talking about his family and other topics. Townsend tried to bring Hernandez' attention back to the advisory form. The following colloquy occurred:

Townsend: Because of my job as a police officer, I live by a lot of rules. And I have expectations. And I live by upholding the rights of individuals. Ok?

Hernandez: And because of my job as a civilian I live by a lot of rules. I respect them a lot more than I probably should.

Townsend: And that's what makes socie . . . .

Hernandez: I get disrespected more than I probably should. But that's nor [sic] here nor there.

Townsend: To talk to you about this, [Hernandez], I'd like for you to know that you understand this and to agree to talk to me. Is that something you can do?

Hernandez: I can try.

Townsend: Ok, would you be willing to sign here?

Hernandez: I guess. Well, what do I sign, my name? You [inaudible] my name.

Townsend: Is this your name right here?

Hernandez: [Inaudible] I was around in things that happened in the '70s, supposedly. Everybody swears I wasn't there. Do you know what I mean? I've got cousins upon cousins telling me, "You couldn't have been there." You know what I'm saying? "That didn't happen." Well, I know that happened. I was there. I was there when this happening [sic] in Grandma's front yard. I was there when Grandpa kept bringing all this fucking [inaudible].

Hernandez: [Pointing at the rights advisory form and stating,] I just want to know if this is my name or not.

Townsend: Well, I believe that's what your name to be. I mean you've got a tattoo there on your forearm that says "Desi."

Hernandez: That's why I'm slowly putting all this shit on my body.

Hernandez then complained that he was shocked with a Taser and began discussing other topics like his family and childhood. He then said, "You guys probably don't even know where this is coming from. I'm just fed the fuck up. I'm fed up with lies."

At many times during the interview, Hernandez would change the topic or talk about things that were not responsive to the question he was asked. He spoke multiple times at length about his family, wondering whether various family members were actually his family members.

Hernandez also made multiple odd or nonsensical statements, such as statements about people having two stomachs like cows and about defecating being similar to having a child.

Townsend then told Hernandez that Hernandez' perspective of what happened mattered. Hernandez interjected, "Yeah, I'm catching everything you are saying."

Townsend asked Hernandez why he shot Debella, and Hernandez denied shooting him. Townsend told Hernandez that other people had told him that Hernandez shot Debella. Hernandez said, "Well as far as things go, anything I say can incriminate me and put me in prison."

Townsend told Hernandez that Hall told him what had happened. Hernandez then claimed he was in the basement "smoking dope" with Debella and went upstairs to ask Hall and McPherson if they wanted to smoke dope. Hernandez did not want to wait on Hall, so he left. Hernandez claimed he did not hear any gunshot.

Townsend told Hernandez that what makes people interested in a case is "the why" behind what happened and that people want to know what Debella did to offend Hernandez. Hernandez said, "What did he do to offend me? Well, there's a number of things." Townsend asked him if he was upset that Debella was not cutting him in on his profits. Hernandez said, "It's not about the profits, it's about respect." Later in the interview, Hernandez said, "Never once. [Debella's] never showed me respect from the very first time I ever met him." Townsend asked, "Is that why you got upset and shot him?" Hernandez said, "No, no, no. And I didn't shoot him. Thanks for that addition, though."

At some time during the interview, Hernandez said, "I think I'll probably stop talking now." Townsend said, "What's that?" Hernandez repeated, "I think I'll probably stop talking

now." Townsend said "ok," paused, and then started talking about the importance of getting Hernandez' side of the story. Townsend then told Hernandez that he is a unique person. Hernandez replied:

> And I'm very intelligent. I know what I'm doing. All this shit right here. [Circling the rights advisory form in pen and stating,] I don't run around trying to do all this shit because I think I'm a badass or a hardass or I can prove something. I do all this because I know all this shit that happens [pointing at rights advisory form with a pen in hand] in the court of law. All this shit happens for a reason, which is good. And some of it I love too much, you know what I'm saying, as far as reading people's cases, this and that, and the other. I can go and tell you where the judge, the prosecutor, and your lawyer fucked you. . . . I can tell you who can be judges and who can be lawyers and who can be prosecutors.

Townsend also asked Hernandez about the gun. Hernandez said, "That was [Debella's] revolver. That revolver don't belong to me." Townsend asked Hernandez how, if the gun belonged to Debella, Hernandez ended up using it. He replied, "Let's just say because [Debella's] careless."

Townsend again talked about the importance of honesty and asked Hernandez whether his story was going to change once DNA testing results were received. Townsend stressed that no matter what Hernandez had done, he could still have his integrity and honesty and not be a liar. Hernandez said, "A liar is a liar because they lie to themselves."

Townsend asked Hernandez if he was lying to himself about shooting Debella. Hernandez said no. Townsend asked, "Did you shoot [Debella]?" Hernandez then confessed, "Did I shoot [Debella]? Yes, I did." He told Townsend that he left the gun "right there." When pressed more about his motive, Hernandez said, "He was stepping on my toes, we can say."

Townsend asked Hernandez if he was sorry about what happened. Hernandez replied, "Of course I am." He started talking about how he was raised and then said, "But as far as

[Debella] goes, if I could take everything back, that's what I'd love to do."

Near the end of the interview, Hernandez asked, "Who told you I shot [Debella]?" Townsend said, "You just told me that you shot [Debella]." Hernandez said, "Of course I did. But I also told many a people that Bill Clinton was my daddy. Or I shot John F. Kennedy too. Can you guys believe that? Would you believe that? No." Similarly, several minutes later, Hernandez said, "You're so convinced I shot him. . . . Who told you that I shot him?" Townsend said, "You just did." Hernandez said, "I also told you that I shot John F. Kennedy. Can you prove that?"

At the end of the interview, Hernandez put his face in his hands, and as Townsend was starting to ask another question, Hernandez said, "Boss, I think we should end this interview right now. If we could please. I'd much rather talk later." The investigators ended the interview, which lasted approximately 2 hours.

### 6. MOTION TO SUPPRESS

Prior to trial, Hernandez moved to suppress the statements made in the August 6, 2015, interview on the basis that they were involuntary or taken in violation of his *Miranda*[4] rights. At a hearing to determine the statements' admissibility, Hernandez argued that his statements were not voluntary and that he could not waive his *Miranda* rights "due to his mental state and the influence of illegal narcotics in his system."

At the hearing, the video of the interview was introduced and the court heard testimony from Townsend and the Falls City Police Department's chief of police.

Townsend testified that prior to Hernandez' interview, investigators had spoken with Seager and Gates. Gates told investigators that Hernandez appeared to be "high" when he arrived at her house the day before the interview.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Townsend testified that a baggie of what appeared to contain methamphetamine was found on the passenger side of Seager's truck, where Hernandez had been sitting. But no evidence of methamphetamine or other drug use was found in Gates' residence where Hernandez was apprehended.

Townsend explained that his technique for interviews is to initially build rapport. He said that neither he nor Frederick yelled or raised their voices during the interview. The temperature and lighting in the interview room were normal. The interview lasted around 2 hours, without any breaks. Townsend said that Hernandez did not appear overly tired and was "very focused."

Townsend testified that Hernandez did not demonstrate any behaviors associated with methamphetamine use at the time of the interview. Although Townsend did not know when Hernandez had last used methamphetamine or any other drugs, Hernandez had been in custody for approximately 12 hours, so Townsend assumed he had not had any during that time. Townsend thought Hernandez' "odd" statements were the result of his personality or a "show or display."

The district court overruled Hernandez' motion to suppress. In its findings of fact, the court noted that the interview began approximately 11½ hours after Hernandez was arrested. The court said that Hernandez "was articulate at times" and "appeared coherent throughout the interview." The court said that Hernandez' lack of focus "was not because Hernandez was delusional or under some type of drug but because he . . . [h]ad emotional difficulty trying to admit his actions involving his cousin [Debella] and . . . was aware of the legal consequences of his admission."

The court concluded that Hernandez' statements were not involuntarily made and that his *Miranda* waiver was also voluntary. It further found that his statement midway through the interview was not a clear, unequivocal, unambiguous invocation of the right to remain silent.

### 7. MOTION IN LIMINE

Hernandez also filed a motion in limine to exclude certain statements made during the interview. The motion requested that the court exclude various statements, primarily about his past behavior and his family, on the basis of Neb. Evid. R. 401 to 403.[5]

The district court overruled Hernandez' motion in limine in part and in part sustained it. The court excluded statements by Hernandez about being in prison, about "screwing [a] bitch," and about a prior assault conviction for slitting an individual's throat. The court also found that "while there are many statements made by [Hernandez] during [the] interview that seem irrelevant[,] any unfair prejudice (403) is outweighed by [the] necessity for [the] fact finder to consider context within [the] interview and [Hernandez'] voluntariness of his ultimate confession."

### 8. CLOSING ARGUMENTS

At the conclusion of the State's closing arguments, Hernandez moved for a mistrial based upon several statements made by the prosecuting attorney. These statements are set forth in greater detail in our discussion of Hernandez' assignment of error on this topic. The district court overruled Hernandez' motion for mistrial, finding that if any of the statements were improper, they were harmless.

### 9. JURY VERDICTS AND SENTENCES

The court instructed the jury on determining the voluntariness of the statements made by Hernandez in his interview with the investigators. The instruction required the jury to find that he understood what he was saying and made the statements freely and voluntarily under all of the circumstances. If the jury did not find that this was established by proof beyond a reasonable doubt, it was instructed to disregard the statements even if it believed them to be true.

---

[5] See Neb. Rev. Stat. §§ 27-401 to 27-403 (Reissue 2016).

The jury found Hernandez guilty on all three counts. He was sentenced to life imprisonment for the first degree murder conviction and 3 to 7 and 5 to 10 years' imprisonment on the other two convictions, all to run consecutively.

## III. ASSIGNMENTS OF ERROR

Hernandez assigns, combined and restated, that the district court erred in (1) admitting the video of his interview with law enforcement officials, (2) not redacting various statements made in the interview pursuant to evidence rules 401 to 403, and (3) overruling his motion for mistrial based on statements made by the prosecution in closing arguments.

## IV. STANDARD OF REVIEW

[1] Whether a defendant voluntarily made a statement while in custody and whether a defendant unambiguously invoked his or her right to remain silent or to have counsel present are mixed questions of law and fact. We review a trial court's finding of historical facts for clear error and independently determine whether those facts satisfy the constitutional standards.[6]

[2] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[7]

[3,4] Whether to grant a motion for mistrial is within the trial court's discretion, and this court will not disturb its ruling unless the court abused its discretion.[8] A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[9]

---

[6] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[7] *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

[8] *Id.*

[9] *Id.*

## V. ANALYSIS

Before delving into the assignments of error, we note that it is not entirely clear from Hernandez' brief whether his constitutional arguments are grounded solely in the U.S. Constitution or also in the Nebraska Constitution. Because Hernandez has not argued to the contrary, we will adhere to our practice of construing the provisions of the bill of rights in article I of the Nebraska Constitution in lockstep with the U.S. Supreme Court's construction of parallel provisions in the U.S. Constitution.[10]

### 1. Admission of Video Interview

We first consider Hernandez' assignment that the district court erred in overruling his motion to suppress and admitting the video of his interview with law enforcement officials. Hernandez argues that the video should have been excluded because the statements in the video were obtained involuntarily in violation of the Fifth Amendment prohibition of compelled self-incrimination, Hernandez did not validly waive his *Miranda* rights, and Hernandez invoked his right to remain silent during the interview.

### (a) Voluntariness of Confession

[5] The 5th Amendment to the U.S. Constitution—applicable to state governments by incorporation through the 14th Amendment—protects against compelled self-incrimination by providing that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself . . . ."[11] This constitutional provision, along with the Due Process Clause of the 14th Amendment, prevents the use of involuntary confessions in criminal prosecutions.[12] Likewise, the Nebraska Constitution

---

[10] See, *State v. Baker*, 298 Neb. 216, 903 N.W.2d 469 (2017); *State v. Rocha, supra* note 7; *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[11] U.S. Const. amend. V; *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

[12] *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *State v. Turner*, 288 Neb. 249, 847 N.W.2d 69 (2014).

bars the use of involuntary confessions.[13] These constitutional protections are rooted not only in the risk of false confessions flowing from the use of coercion, but also in the right of citizens to be free from oppressive overreaching at the hands of government officials.[14]

[6] To overcome a motion to suppress, the prosecution has the burden to prove by a preponderance of the evidence that incriminating statements by the accused were voluntarily given and not the product of coercion.[15]

[7] In determining whether an accused's statement was given freely and voluntarily, courts examine police conduct in light of the totality of the circumstances, including the tactics used by the police and the details of the interrogation.[16] Importantly for Hernandez' argument, relevant factors include any characteristics of the accused known to police, which might cause his or her will to be easily overborne, such as a defendant's mental state or intoxication.[17]

Hernandez argues that the statements made in the video interview were not voluntary for purposes of the Fifth Amendment, because they were made while he was under the influence of methamphetamine. We disagree.

While intoxication is relevant to determining whether police conduct amounted to coercion, "[i]ntoxication does 'not automatically render a confession involuntary . . . .'"[18]

[8] We have repeatedly said that coercive police activity is a necessary predicate to a finding that a confession is not

---

[13] Neb. Const. art. I, §§ 3 and 12.

[14] See, *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *Jackson v. Denno, supra* note 12.

[15] *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

[16] See *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010).

[17] See, *State v. Melton*, 239 Neb. 790, 478 N.W.2d 341 (1992); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983).

[18] *U.S. v. Jones*, 842 F.3d 1077, 1083 (8th Cir. 2016).

voluntary.[19] The prohibition on the use of involuntary confessions is at its core—like other constitutional rights—a limitation on the power of government.[20] Thus, the focus of this inquiry is on the conduct of governmental actors.[21]

This principle is demonstrated in the U.S. Supreme Court case *Colorado v. Connelly*,[22] in which the defendant approached a police officer on the street and made an unprompted confession that he had murdered someone and wanted to talk about it. The confession was suppressed by a Colorado trial court, and the suppression was affirmed by the Colorado Supreme Court, based on evidence that the defendant suffered from schizophrenia and was in a psychotic state at the time of the confession.[23] The defendant heard what he believed to be the "'voice of God'" telling him to confess to the murder or commit suicide.[24] The Colorado courts concluded that the confession was involuntary, because it was not "'the product of a rational intellect and a free will.'"[25]

The U.S. Supreme Court reversed the decision of the Colorado Supreme Court, concluding that the confession was voluntary for purposes of the Due Process Clause.[26] The Court said that its voluntariness cases have all "focused upon the

---

[19] See *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016). See, also, *State v. Dubray, supra* note 10; *State v. McClain, supra* note 15; *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011); *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009).

[20] See, generally, *NCAA v. Tarkanian*, 488 U.S. 179, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988) (state action doctrine); *Colorado v. Connelly, supra* note 14 (coercion and state action); *State v. Dubray, supra* note 10 (confession to private citizens).

[21] *Colorado v. Connelly, supra* note 14. See, also, *State v. Dubray, supra* note 10.

[22] *Colorado v. Connelly, supra* note 14.

[23] *Id.*

[24] *Id.*, 479 U.S. at 161.

[25] *Id.*, 479 U.S. at 162.

[26] *Colorado v. Connelly, supra* note 14.

crucial element of police overreaching" and each contained "a substantial element of coercive police conduct."[27] The Court contrasted the facts in *Connelly* to the facts of a prior case[28] in which a confession was deemed involuntary where the police knew of a defendant's history of mental illness and exploited it with coercive tactics such as an 8- to 9-hour interrogation in a tiny room in isolation from family, friends, or legal counsel.[29] The Court reversed, because it concluded that the Colorado Supreme Court's approach "fail[ed] to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other."[30]

Again, the primary basis of Hernandez' argument is that he was under the influence of methamphetamine. He points to the fact that, as the investigators knew, he had used methamphetamine the day before the interview. He also points to the many odd statements made during the interview. He also raises the question of whether he had adequate sleep prior to the interview.

Applying the voluntariness factors set forth above, a review of the video interview reveals no overreaching or coercive conduct by law enforcement.

The demeanor of each investigator was calm and relaxed. Throughout the interview, Townsend focused on building rapport with Hernandez and appealing to his better instincts, such as a belief in the importance of telling the truth. The investigators never raised their voices, took an aggressive demeanor, or unfairly manipulated or lied to Hernandez. Hernandez was also allowed to speak at length without interruption on a variety of topics well afield of the scope of the interview, with eventual gentle redirection.

---

[27] *Id.*, 479 U.S. at 163, 164.

[28] *Blackburn v. Alabama*, 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960).

[29] *Colorado v. Connelly, supra* note 14.

[30] *Id.*, 479 U.S. at 165.

The interview was only about 2 hours long, and there was nothing unusual or oppressive about the environment in which it was conducted. There is no evidence in the record that Hernandez was ever kept from sleeping, and Townsend testified that Hernandez appeared reasonably well rested.

Hernandez undoubtedly made numerous strange statements in the interview. It is possible he felt some effect from the residual methamphetamine in his body from smoking the day before, was not in a state of full mental health, or both. But such facts are not dispositive. As we have explained, intoxication and mental illness alone are insufficient to render a confession involuntary.[31] The record belies any notion that the investigators exploited Hernandez' mental state in order to overbear his will and wring out a confession. To the contrary, Hernandez was certainly coherent and able to intelligently answer questions with specificity and in a reasonably articulate manner when he chose to do so. The questioning was entirely appropriate for someone in Hernandez' state.

Moreover, some of Hernandez' statements indicate that several of his strange comments may have been strategic, rather than the product of drugs or his mental condition. When confronted with the fact that he said he shot Debella, he said, "Of course I did. But I also told many a people that Bill Clinton was my daddy. Or I shot John F. Kennedy too. Can you guys believe that? Would you believe that? No." He made a similar comment after another reminder of his previous confession: "I also told you that I shot John F. Kennedy. Can you prove that?"

These statements show that, at least sometimes, Hernandez made absurd statements in an effort to undermine the credibility of his incriminating statements. It is thus doubtful whether all of his off-the-wall comments were truly the result of intoxication or an unsound mental state.

---

[31] See, *Colorado v. Connelly, supra* note 14; *U.S. v. Jones, supra* note 18. See, also, *State v. Goodwin, supra* note 19.

Additionally, Hernandez' ability to think clearly was illustrated by the fact that he began the interview by asking the Nebraska investigators why they were questioning him in Kansas. Questioning the territorial scope of law enforcement jurisdiction reveals a reasonably cogent mind.

Because we find no evidence of coercion on the part of law enforcement officials, we conclude that Hernandez' statements were made voluntarily. The district court did not err in overruling Hernandez' motion to suppress or his trial objections regarding the admission of the video interview.

(b) Waiver of *Miranda* Rights

Hernandez also argues that the district court erred in admitting the video interview, because he did not voluntarily waive his *Miranda* rights to remain silent and to counsel.

In *Miranda v. Arizona*,[32] the U.S. Supreme Court announced the rule that confessions obtained in custodial interrogations may not be used in criminal prosecutions unless certain procedural safeguards were met, including advising the detainee of his or her constitutional right to remain silent and right to counsel.[33] These rights must be knowingly and voluntarily waived.[34]

Although the *Miranda* rule and the requirement that confessions be made voluntarily both arise out of the Fifth Amendment, the question of whether a custodial interrogation complies with *Miranda* is distinct from the question of whether statements made during a custodial interrogation were sufficiently voluntary.[35] The *Miranda* warnings are an "absolute prerequisite" to custodial interrogation; statements made during a custodial interrogation in the absence of these

---

[32] *Miranda v. Arizona, supra* note 4.

[33] *Id.*

[34] *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986*)*; *Miranda v. Arizona, supra* note 4; *State v. Goodwin, supra* note 19.

[35] See, *Miranda v. Arizona, supra* note 4; *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009); *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006).

warnings and a valid *Miranda* waiver are inadmissible, even if otherwise voluntarily made.[36]

[9] To be a valid waiver of *Miranda* rights, the waiver must be "'knowing' and 'voluntary.'"[37] A waiver is "knowing" if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[38] A waiver is "voluntary" if it is "the product of a free and deliberate choice rather than [through] intimidation, coercion, or deception."[39] The standard for determining voluntariness in the context of a *Miranda* waiver is the same standard used to determine the voluntariness of confessions, which we have discussed in detail above.[40] Whether a knowing and voluntary waiver has been made is determined by looking to the totality of the circumstances.[41]

The parties do not dispute that Hernandez was given a *Miranda* rights advisory. The issue is whether Hernandez knowingly and voluntarily waived his *Miranda* rights. After a review of the evidence, we find that he did.

First, several of Hernandez' statements show that he understood his rights. One comment is of unique importance. At one point in the interview, Hernandez said, "[A]nything I say can incriminate me and put me in prison." This statement is strong evidence of his understanding of his rights. Additionally, Hernandez' clear and unequivocal invocation of his right to remain silent at the end of the interview indicates that he understood that right as well.

Hernandez also boasted of his understanding of the legal system, saying, "I know all this shit that happens in the court

---

[36] *Miranda v. Arizona, supra* note 4, 384 U.S. at 468.

[37] *Moran v. Burbine*, *supra* note 34, 475 U.S. at 419. Accord *State v. Goodwin, supra* note 19.

[38] *Moran v. Burbine, supra* note 34, 475 U.S. at 421.

[39] *Id.*

[40] See *Colorado v. Connelly, supra* note 14.

[41] *State v. Burries, supra* note 6.

of law." He spoke about how he liked to read other people's cases and understood how they were disadvantaged by the legal system.

Testimony was presented at the suppression hearing that Hernandez was questioned in connection with a prior assault conviction, and at that time, he signed a rights advisory form and seemed to understand his rights.

Hernandez also expressly indicated that he understood his rights. When Townsend asked him if he understood, Hernandez said "Yeah, I'm still focusing on the shooting." After Hernandez gave this response, Townsend asked him, "Do you want me to explain or to repeat any of that?" Hernandez shook his head "no," indicating that he understood his rights.

[10,11] Not only did Hernandez understand his rights, but he voluntarily waived them. An express waiver of a suspect's *Miranda* rights is not required to be made in writing; an oral waiver is sufficient.[42] In addition, the U.S. Supreme Court has said that a *Miranda* waiver need not be express, but can be implied.[43] A "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver," may establish a valid, implied waiver.[44] Thus, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."[45]

As discussed, the evidence shows that Hernandez understood these rights. Thus, by voluntarily speaking with the investigators, Hernandez impliedly waived his rights.[46]

---

[42] *U.S. v. Sturdivant*, 796 F.3d 690 (7th Cir. 2015); *U.S. v. Murdock*, 491 F.3d 694 (7th Cir. 2007). See, also, *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

[43] *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

[44] *North Carolina v. Butler, supra* note 42, 441 U.S. at 373.

[45] *Berghuis v. Thompkins, supra* note 43, 560 U.S. at 384.

[46] See, *Berghuis v. Thompkins, supra* note 43; *North Carolina v. Butler, supra* note 42.

Not only did Hernandez' conduct constitute an implied waiver, but he also validly provided an express oral waiver. When Townsend asked Hernandez if he would be willing to speak with him, Hernandez said, "I can try." When asked to sign the rights advisory form to express this waiver in writing, he said, "I guess," and leaned forward to sign before getting sidetracked and moving on to another topic. Hernandez' statements and conduct constitute an express waiver of his *Miranda* rights.

### (c) Invocation of Right to Remain Silent

Hernandez also argues that the video interview should have been excluded, because he invoked his right to remain silent when he said, "I think I'll probably stop talking now." We disagree. An invocation of the right to remain silent or right to counsel must be clear, unambiguous, and unequivocal.[47]

[12] Here, to "think" about "probably" being silent is ambiguous and equivocal. In *State v. Rogers*,[48] we discussed how statements prefaced by equivocal words like "I think," "maybe," or "I believe" generally do not constitute a clear, unambiguous, and unequivocal invocation.

Hernandez' equivocal statement about how he thought he would "probably stop talking" stands in stark contrast to his unequivocal invocation of his right to remain silent at the end of the interview, which was scrupulously honored. Hernandez said, "Boss, I think we should end this interview right now. If we could please. I'd much rather talk later." When he wanted to exercise his right to remain silent, rather than merely musing about probably stopping talking, Hernandez was very capable of requesting that the interviewers "end this interview right now."

---

[47] See, *Berghuis v. Thompkins, supra* note 43; *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *State v. Rogers, supra* note 35.

[48] *State v. Rogers, supra* note 35.

We conclude that Hernandez' statement, "I think I'll probably stop talking now," was not a clear, unambiguous, and unequivocal of his right to remain silent and terminate the custodial interrogation.

Because Hernandez validly waived his *Miranda* rights, voluntarily spoke with the investigators, and did not subsequently invoke his right to remain silent until the end of the interview, we conclude that the district court did not err in denying Hernandez' motion to suppress and trial objections to the video interview.

## 2. Relevance and Rule 403

Hernandez also argues that the district court erred in overruling in part his motion in limine and trial objections and admitting various statements in Hernandez' interview with the investigators. He argues first that these statements were not relevant and, secondly, that even if relevant, the statements should have been excluded under rule 403. We conclude that the district court did not abuse its discretion in finding the statements were relevant. Nor did it abuse its discretion in finding that the statements were not inadmissible under rule 403.

### (a) Relevance

[13] Evidence which is not relevant is inadmissible.[49] To be relevant, evidence must be probative and material.[50] Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence.[51] A fact is material if it is of consequence to the determination of the case.[52]

The district court determined that Hernandez' statements were relevant to show the voluntariness of his confession in

---

[49] § 27-402.

[50] *State v. Rocha, supra* note 7.

[51] *Id.*

[52] *Id.*

his interview with law enforcement. We find that this was not an abuse of discretion.

At the suppression hearing, the State was required to prove that Hernandez' confession was voluntary by a preponderance of the evidence. At trial, in order to rely on the confession, the jury was required to find voluntariness beyond a reasonable doubt. Thus, evidence probative of the voluntariness of Hernandez' statements in the interview is relevant and the statements made by Hernandez in the interview are undoubtedly relevant to the voluntariness of Hernandez' confessions in the interview. Accordingly, the district court did not abuse its discretion in determining that the statements Hernandez sought to exclude were relevant.

### (b) Rule 403

Even relevant evidence is not automatically admissible.[53] It must pass muster under rule 403.[54] Under rule 403, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[55]

[14,15] Rule 403 considers the danger of *unfair* prejudice. Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party.[56] In the context of rule 403, unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[57] Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.[58] When considering whether evidence of other

---

[53] *Id.*

[54] *Id.*; § 27-403.

[55] *State v. Rocha, supra* note 7.

[56] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

[57] *Id.* See, also, *State v. Baker, supra* note 10; *State v. Rocha, supra* note 7.

[58] *State v. Oldson, supra* note 56.

acts is unfairly prejudicial, we consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.[59]

When trial courts admit recorded conversations or interviews, it does not follow that they must be in an unredacted form.[60] Hernandez rightly points out that "[c]onfessions are not an all-or-nothing proposition."[61]

We first note that the district court did sustain Hernandez' motion in limine in part and excluded discussion of an incident where he slit a person's throat, a reference to being in prison, and a comment about "screwing [a] bitch." These statements, especially the lengthy discussion about his prior assault, certainly bear a significant risk of unfair prejudice.

But the statements that the district court admitted and that Hernandez challenges do not bear the same risk of unfair prejudice. The bulk of the statements challenged by Hernandez pertain to his family. His brief refers to the "perceived abuse inflicted upon Hernandez by his parents."[62] His statements show a negative perception of many family members. Additionally, his wondering whether various family members are truly his family members is a recurring theme.

Hernandez' statements about his family do not bear a significant risk of unfair prejudice. The fact that Hernandez does not have a healthy relationship with or a positive view of some members of his family, or that he has suffered abuse, is unlikely to make the jury more likely to convict him on that improper basis. This is not to say that there is no risk of unfair prejudice from these statements, just that it is not substantial.

Hernandez' statements about his family also have some probative value on the issue of voluntariness. As discussed

---

[59] Id.

[60] See State v. Rocha, supra note 7.

[61] Brief for appellant at 39.

[62] Id.

above, the voluntariness of a statement is considered in light of the totality of the circumstances, including the suspect's mental state or intoxication.[63] Hernandez wondered at various times whether certain family members were who he was told they were. These comments, which could be characterized as paranoia, have some probative value with respect to Hernandez' mental state or intoxication, and thus with respect to the issue of voluntariness.

Hernandez also sought to exclude statements in which he referenced "gang-banging" in his past and not believing in God. While these types of statements generally can carry a risk of unfair prejudice, they were in this case isolated statements in the context of a 2-hour interview. These comments were made briefly and were not repeated. This is not to say that there is no risk of unfair prejudice, but merely that the risk of prejudice is not nearly as grave as if the interview contained an extended conversation on these topics.

In sum, Hernandez' statements about his family have little risk of unfair prejudice but also only moderate probative value. His statements about "gang-banging" and not believing in God carry some risk of prejudice, but not significant given the isolated and brief nature of those comments. Whether the risk of unfair prejudice substantially outweighed the probative value of these statements is a question left to the discretion of the trial court.[64] We conclude that the district court did not abuse its discretion by overruling in part Hernandez' motion in limine and trial objections.

### 3. CLOSING STATEMENTS

Finally, we turn to Hernandez' assignment that the district court erred in overruling his motion for mistrial on the basis that statements made by the prosecuting attorney in his closing arguments constitute prosecutorial misconduct.

---

[63] See *State v. Goodwin, supra* note 19.

[64] See *State v. Baker, supra* note 10.

[16] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[65] We have acknowledged that "prosecutorial misconduct" cannot be neatly defined, but we have said that generally, it encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[66] We have also said that a prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[67]

[17] If we conclude that a prosecutor's acts were misconduct, we next consider whether the misconduct prejudiced the defendant's right to a fair trial.[68] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the resulting conviction violates due process.[69]

Hernandez divides the statements into two categories of prosecutorial misconduct: statements of personal belief/imprimatur of government and statements that inflame the prejudices or excite the passions of the jury against the accused. We consider each in turn.

(a) Statements of Personal Belief/
Imprimatur of Government

[18,19] Prosecutors generally may not give their personal opinions on the veracity of a witness or the guilt or innocence of the accused.[70] The principle behind this rule is that

---

[65] See *State v. Dubray, supra* note 10.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] See Neb. Ct. R. of Prof. Cond. § 3-503.4 ("[a] lawyer shall not . . . in trial, . . . state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused"). See, also, *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

the prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own view of the evidence.[71] Stated differently, when a prosecutor asserts his or her personal opinions, the jury might be persuaded by a perception that counsel's opinions are correct because of his position as a prosecutor, rather than being persuaded by the evidence. Thus, when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense.[72]

Hernandez argues that the prosecutor in this case made a number of statements improperly expressing his personal beliefs. These statements include:

[1] The fact that he had a point to prove and that he then acted upon that point by shooting . . . Debella is among the numerous reasons the State of Nebraska believes that this crime is a premeditated first degree murder because it shows he thought about what he wanted to do and hoped to accomplish before he actually did it.
. . . .
[2] The State believes that when you consider all of the evidence, not just one piece, not just two, but you consider all the evidence in totality, the State believes that it has more than satisfied its burden to prove that this is, in fact, a first degree premeditated murder committed by . . . Hernandez, and that he, likewise, used a firearm to commit a felony, that being the murder, and was a felon at the time he committed his offense and it was unlawful for him to possess that gun he used to kill . . . Debella.

---

[71] *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

[72] See *State v. Gonzales, supra* note 70.

[3] Accordingly, the State of Nebraska is asking you, based upon the totality of the circumstances, evidence, testimony you've heard over these past four days, to return a guilty verdict against . . . Hernandez for each of these crimes.

[4] Ladies and Gentlemen, to be perfectly honest with you, when looking and reflecting back on the testimony and evidence you've heard throughout the course of this case, I don't know that there is sufficient words in the dictionary or adjectives in the thesaurus to describe the selflessness [sic], the senseless, the heartlessness, the disgusting acts committed not by just by . . . Hernandez but, also, by the likes of John Hall, Brett Winters, and Dave McPherson. It, honestly, made me sick and it makes me sick that the State had to present any of these witnesses before you in its case in chief in hopes that you'll realize that this was only necessary because of the fact that . . . Debella was the victim of the ultimate injustice that one human can commit against another.

. . . .

[5] So the State believes that [the testimony of the firearms examiner] has helped us corroborate another thing that . . . Hernandez tells us in his statement and that is that he left that gun there.

After reviewing these statements, we find that the first, second, third, and fifth statements do not constitute prosecutorial misconduct. Although each of these statements contains the phrases "the State believes" or "the State of Nebraska is asking you," merely using such phrases does not turn an otherwise proper summation of the evidence into an improper one.[73]

In the first statement, the prosecutor was relying on Hernandez' statement that he "had a point to prove" as evidence that the murder was premeditated. Although the prosecutor said

---

[73] See *State v. Green*, 287 Neb. 212, 229, 842 N.W.2d 74, 91 (2014) ("[s]o, while the prosecutor might have referenced his personal beliefs, it appears that such were a deduction from the evidence").

"the State of Nebraska believes," within that statement, the prosecutor was merely attempting to point to evidence supporting a finding that the murder was premeditated.

In the second statement, although the prosecutor again used the statement "the State believes," the prosecutor was simply arguing that the jury should consider all the evidence and find that the State had met its burden. This is not improper.

In the third statement, the prosecutor said that "the State of Nebraska is asking you, based upon the totality of the circumstances, evidence, [and] testimony . . . to return a guilty verdict." Again, the prosecutor is merely asking the jury to consider all the evidence and to return a guilty verdict, which is not improper.

In the fifth statement, the prosecutor said that "the State believes that [the testimony of the firearms examiner] has helped us corroborate another thing that . . . Hernandez tells us in his statement and that is that he left that gun there." Although the phrase "the State believes" is used, the prosecutor is simply arguing that certain evidence—the expert's testimony—helped corroborate Hernandez' statement.

Although we find that these specific statements were not misconduct within their context in this particular case, there are many circumstances where "I" statements—"I think," "I know," "I believe," "the State of Nebraska believes," et cetera—could be considered as conveying a personal opinion and are thus misconduct.

We have previously encouraged prosecutors to preface any questionable statements with the phrase "'the evidence shows.'"[74] We emphasize, once again, that prosecutors could easily avoid an appearance of impropriety by simply substituting "I believe" or "the State believes" with the simple phrase "the evidence shows."

The fourth statement is another matter. It contains an improper personal opinion not based on any evidence. Within that statement, the prosecutor told the jury that it "honestly"

---

[74] *State v. Gonzales, supra* note 70, 294 Neb. at 649, 884 N.W.2d at 119.

"made [him] sick" that the State had to present certain witnesses as part of its case in chief. Although we understand that the prosecutor was attempting to acknowledge the lack of credibility in his witnesses, the manner in which he attempted to do so was highly improper. This statement was not a summation of the evidence. The prosecutor was expressing a personal opinion not based on any evidence; this is clearly prosecutorial misconduct.

The fourth statement also constitutes prosecutorial misconduct for other reasons, which shall be discussed below.

### (b) Statements That Inflame Prejudices or Excite Passions of Jurors

[20] Prosecutors also may not inflame the jurors' prejudices or excite their passions against the accused.[75] Prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities and personal attributes of the victim.[76] These facts lack any relevance to the criminal prosecution and have the potential to evoke jurors' sympathy and outrage against the defendant.[77]

Hernandez argues that the fourth statement, described above, was intended to inflame the prejudices of the jurors and to excite their passions. He makes the same argument regarding the following statements made by the prosecutor in his closing arguments:

[6] From every account you've heard these past four days, including that given by . . . Hernandez, . . . Debella's sins were, at most, punishable by incarceration, not eternal rest in a coffin, particularly at the hands of a man whose primary complaint was that . . . Debella was stepping on his toes.

. . . .

---

[75] *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011). See, also, *State v. Dubray, supra* note 10.

[76] *State v. Iromuanya, supra* note 75.

[77] *Id.*

[7] We know that [Debella] fought hard for his life. We heard about how he was gasping for breath and trying to hang on. We know that he held on in the hospital for eight days afterwards with the assistance of machines. We heard from [his mother] about the heart-wrenching decision she had to make in taking him off those machines . . . . She held on as long as she could.

Hernandez also complains that the prosecutor referred to the other individuals living in the Brownell house as "vermin," "riffraff," and "lowlife people, so low that they would let a bleeding man lie on the floor."

We agree with Hernandez that all of these statements constitute prosecutorial misconduct. The prosecutor's comment about "the selflessness [sic], the senseless, the heartlessness, the disgusting acts" committed by Hernandez and others was clearly improper. This type of a comment is an appeal to the emotions of the jurors, not an argument regarding any of the elements of the crimes charged. The prosecutor's comments about Debella's fighting for his life and Debella's mother's having to make the "heart-wrenching" decision to take him off life support, as well as the reference to Debella's being punished by "eternal rest in a coffin," were all clearly intended to play on the jurors' emotions by attempting to draw sympathy to Debella and his mother, which is entirely improper.[78]

Referring to the individuals that lived in the Brownell house as "vermin," "riffraff," and "lowlife people" is improper. This type of name calling has no place in a criminal prosecution. While this language was not directed at Hernandez, it was used to describe those living in the Brownell house. This language certainly reflected on Hernandez by his association with those individuals.

Because we find that the prosecutor's statements constituted prosecutorial misconduct, we must consider whether the misconduct prejudiced Hernandez' right to a fair trial.

---

[78] See *id.*

As we said in another prosecutorial misconduct case, "the prosecutor has dodged a reversal" in this case.[79] Despite the fact that a number of the prosecutor's statements constitute prosecutorial misconduct, the evidence against Hernandez is overwhelming and the misconduct did not prejudice his right to a fair trial.

[21,22] Whether prosecutorial misconduct is prejudicial depends largely upon the context of the trial as a whole.[80] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.[81]

While the prosecutor made several improper remarks in closing arguments, and while a curative instruction from the court would have been warranted, we cannot say that Hernandez' right to a fair trial was prejudiced.

Most importantly, the evidence against Hernandez was overwhelming. Hernandez confessed to shooting Debella to numerous relatives who testified at trial. Moreover, he confessed to law enforcement in a video interview that was played for the jury. He was seen shortly after the shooting by those in the upstairs of the house. There was no evidence that Debella's death was the result of suicide, and there was little to no evidence of any alternative theory of Debella's murder. The jury could also infer Hernandez' guilt from the fact that he ran from police and resisted arrest. It would simply stretch credulity to think that the jury found Hernandez guilty because of the prosecutor's improper statements rather

---

[79] *State v. Dubray, supra* note 10, 289 Neb. at 228, 854 N.W.2d at 605.

[80] *State v. Iromuanya, supra* note 75.

[81] See *id.*

than because of the overwhelming and undeniable evidence of his guilt.

For these reasons, we conclude that Hernandez' right to a fair trial was not prejudiced and the district court did not abuse its discretion in overruling Hernandez' motion for mistrial.

## VI. CONCLUSION

For the reasons set forth herein, we affirm.

Affirmed.

Miller-Lerman, J., participating on briefs.
Wright, J., not participating.

Miller-Lerman, J., concurring.

I concur. The prosecutor's improper statements made in his closing remarks constituted serious prosecutorial misconduct. Were it not for the strength of the evidence supporting the convictions, I would reverse.

Cassel, J., joins in this concurrence.