IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MALCOM

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTOPHER T. MALCOM, APPELLANT.

Filed December 5, 2023.    No. A-22-668.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Candice C. Wooster, of Brennan, Nielsen, & Wooster Law Offices, for appellant.

Michael Hilgers, Attorney General, and Jordan Osborne for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Lancaster County District Court, Christopher T. Malcom was convicted of possession of a firearm by a prohibited person and sentenced to 5 to 7 years' imprisonment. Malcom appeals, claiming there was insufficient evidence to support his conviction, his motion to suppress certain evidence should have been granted, and his sentence was excessive. He also asserts six claims of ineffective assistance of trial counsel. We affirm Malcom's conviction and sentence. We also find the record sufficient to determine that all claims of ineffective assistance of trial counsel fail.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

On June 24, 2021, a search warrant was executed on an apartment in Lincoln, Nebraska; a shotgun, ammunition, and a substance believed to be methamphetamine were confiscated and

- 1 -

Malcom was arrested. The same day, the State filed a complaint in the county court of Lancaster County charging Malcom with two counts: count 1, possession of methamphetamine with intent to deliver, pursuant to Neb. Rev. Stat. § 28-416(10)(b) (Cum. Supp. 2022), a Class IC felony; and count 2, possession of a firearm by a prohibited person, pursuant to Neb. Rev. Stat. § 28-1206(1) and (3)(b) (Cum. Supp. 2022), a Class ID felony. The case was bound over to the district court and on November 10, the State filed an information charging Malcom as set forth in the initial complaint. The State subsequently filed a motion to dismiss count 1, which the court granted.

Malcom filed a motion to suppress in the district court, seeking to suppress the "search warrant and subsequent arrest of [Malcom]" because "when the search warrant was executed, items were included and seized that were not in the apartment unit in the warrant." He also moved to suppress "any and all statements given to police" by Malcom because such "statements were not voluntary and given under advisement of rights." At the hearing on his motion, Malcom argued that the search warrant executed by law enforcement on June 24, 2021, "was issued for unit No. 1," but the firearm seized by law enforcement that day was found in a separate apartment. The State's position was that the area described as a separate apartment was part of apartment 1 and that law enforcement acted in good faith.

The State called Officer Brian Gruber from the Lincoln Police Department (LPD). Officer Gruber testified that as part of an investigation into Malcom in June 2021, he authored an affidavit requesting a warrant to search Malcom's apartment and seize certain items from it. The affidavit was entered into evidence for purposes of the hearing.

In the affidavit, Officer Gruber stated that on June 4, 2021, he "received an anonymous tip from a source of information that there were large quantities of methamphetamine being sold" from an apartment building at an address on 12th Street. The following day, Officer Gruber conducted "drive by surveillance" and observed "short term foot traffic" at the apartment building, which is "consistent with drug sales." On June 6, while surveilling the apartment building from a distance, Officer Gruber observed a vehicle park at the apartment building. The driver exited the vehicle, entered the apartment building, and left within a period of 10 minutes. Officer Gruber contacted the driver after it drove away, and the driver (who was the sole occupant) of the vehicle admitted to there being methamphetamine inside the vehicle. On June 9, while conducting additional surveillance, Officer Gruber observed another vehicle leave from the apartment building. Upon contacting the driver, Officer Gruber again found that the driver was in possession of methamphetamine, along with a firearm and $922 in cash.

Officer Gruber stated that on June 15, 2021, while assisting in an unrelated arson investigation at the same apartment building, he observed that the doors of the apartment units were open. While walking through the apartment building, he "observed there to be several items of drug paraphernalia inside of apartment #1." During the investigation, Officer Gruber contacted Malcom, who stated that he lived in apartment 1 and was the maintenance worker for the apartment building.

Officer Gruber stated that on June 16, 2021, he "had contact with a confidential informant (CI) of known reliability" who claimed that they were present in "apartment #1 almost daily for the last month," during which time they observed over 50 drug transactions take place. The CI informed Officer Gruber that a white male who went by the nickname "Fugi" lived in apartment 1 and was a maintenance worker for the apartment building. The CI stated that Fugi sold

methamphetamine from his apartment with another man, who was described as a "black male with short dreads" and the CI claimed the two men were "connected to the Cartel and received shipments of methamphetamine directly." While at apartment 1 on June 10, the CI had seen Fugi "in possession of an AR-15 style rifle" and observed Fugi "place[] the rifle in a hiding spot." The CI described the hiding spot as a "hole in the wall" behind a dresser in Fugi's apartment. The CI confirmed the identity of "Fugi" as Malcom by identifying him "from a book in photograph." Officer Gruber conducted a criminal history search on Malcom and "observed him to be a convicted felon prohibit[ed] from possessing a firearm."

The search warrant issued based upon Officer Gruber's affidavit was also entered into evidence. It commanded law enforcement "to search [an address on] 12th Street #1, Lincoln, Lancaster County, Nebraska," for illegal substances and items commonly used for their ingestion or preparation and distribution, as well as any firearms, ammunition, or related accessories.

At the hearing, Officer Gruber testified consistently with his affidavit, and he also described the execution of the search warrant. He stated that his initial role in executing the search warrant was to block traffic on 12th Street while the SWAT team served the warrant. The role of the SWAT team was to "make entry and . . . clear the residence," and after declaring the area safe, "turn it over to. . . officers to conduct the search of the apartment." Officer Gruber described apartment 1 as a single room with no bathroom or kitchen. When the SWAT team entered apartment 1, they moved a dresser to expose a hole in the drywall, which led to another room with a bathroom, kitchen, and closet.

Officer Gruber further testified that "most, if not all" of the units in the apartment building were marked with an apartment number, except for apartment 1. He further stated that the "back area through the dry wall" had an exterior door which led to the back of the apartment building and was not marked with an apartment number. Officer Gruber believed the area through the hole in the wall to be a part of apartment 1. He further stated that law enforcement had been informed that the hole had previously been used for people to escape during searches by law enforcement.

Law enforcement found a green case containing a 12-gauge shotgun and ammunition in a closet in the area through the hole. Law enforcement also found ammunition in apartment 1, as well as a substance believed to be methamphetamine. A pretest conducted on the substance showed that it was "positive for the presence of amphetamines," but subsequent crime laboratory testing of the substance did not confirm the presence of methamphetamine.

Officer Gruber testified that Malcom was found in the room through the hole in the wall and the SWAT team arrested him and transported him to the LPD station. Officer Gruber later interviewed Malcom at the station. Officer Gruber did not have a recording of the interview because his body camera died sometime prior to the interview, and he also no longer had access to the interview room recording of the interview. Officer Gruber began the interview by explaining who he was, the types of cases he worked on, and what he specialized in. He also informed Malcom "the reason why [they] were there and that [he] would like to speak with [Malcom]." He then provided Malcom with a *Miranda* advisement by reading aloud a *Miranda* form and writing Malcom's answers to each question on the form. Officer Gruber testified that Malcom did not provide him with any information prior to waiving his *Miranda* rights.

According to Officer Gruber, Malcom made various admissions during the interview. Malcom "mentioned in the interview that it was possible that his DNA or fingerprints could be on

the firearm due to him moving things throughout the apartment." Malcom also stated that he lived in the apartment but that he allowed other individuals to stay there "to get out of the weather." Malcom claimed he was in the process of renovating the area through the hole in the wall and that he had access to the area from his apartment through the hole.

Malcom called Richard Pumel to testify. Pumel and his wife owned the apartment building. Pumel testified that in exchange for maintenance work, he allowed Malcom to live in one of the units in his apartment building. At the time the search warrant was executed, Malcom lived in apartment 1, which was next to apartment 13. Pumel drew a diagram of the apartment building's layout, which depicted apartments 1 and 13 as sharing a wall. Pumel stated that apartment 13 had a door which led to the back of the apartment building, and on June 24, 2021, the door was not marked with an apartment number because "people ke[pt] taking it off." Pumel stated that after the tenant of apartment 13 vacated the unit at the end of May 2021, he and Malcom entered apartment 13 to determine necessary repairs. According to Pumel, at that time, the hole in the wall between apartment 1 and apartment 13 was not there; he claimed it was put there later by Malcom. On cross-examination, Pumel testified that he inspected apartment 13 after the tenant moved out and all the tenant's belongings were out of the apartment except "for some blank cases of DVDs and stuff like that." Pumel also indicated that he did not direct Malcom to replace any drywall or to cut a hole between apartments 1 and 13. Pumel further stated that only he and Malcom had access to apartment 13.

Malcom testified regarding the hole in the wall, stating that he "removed a piece of dry wall" from apartment 1, which allowed him access to apartment 13 from apartment 1. He stated that on the date law enforcement executed the search warrant, the dry wall had been "screwed to the wall but not finished" on the apartment 1 side. On the apartment 13 side there was still a hole. Malcom also testified regarding his interview with law enforcement. When asked whether he was "given the Miranda Warning sheet," he responded "Yes, sir." He stated that he was not under the influence of drugs or alcohol during the interview.

Trial counsel argued that evidence of the "gun should be suppressed . . . because it was not found in Apartment No. 1." The search warrant authorized a search of apartment 1, not apartment 13, which is where the firearm was found. Trial counsel further argued that the "information that was taken from the CI was not reliable." He stated that the CI informed law enforcement that there were controlled substances in Malcom's apartment. However, crime laboratory testing determined that the substance found in the Malcom's apartment contained "no controlled substances in it at all." The CI had reported that there was an AR-15 style firearm "right behind the hole in Apartment No. 1," but the firearm was found "in a completely separate room."

Further, trial counsel noted that he had "real issues" with law enforcement's failure to record its interview with Malcom. Trial counsel suggested there was "no evidence of his going through his Miranda rights" and "it's hard telling what would have been said during that interview without being able to have the record of that interview to say whether there were any promises that were made to . . . Malcom at the time."

The State argued that the area determined to be apartment 13 was covered by the warrant, even though the warrant only specifically authorized a search of apartment "#1," because it was granted based upon Officer Gruber's affidavit, which described the hole in the wall and stated that the apartment to be searched was not numbered. The State argued that Malcom made apartment

13 "part of his apartment" by using the hole through his apartment to access the area, when he and the landlord were the only individuals who had access to it.

The State further argued that "[t]he information from the CI was accurate," considering the "CI had indicated . . . Malcom was hiding in that area; would use that area to escape; and was hiding firearms in there." The State noted that a firearm was indeed found through the hole in the wall and Malcom himself was found in the area. In the alternative, the State argued that if the district court found that the area through the wall was a separate residence, then "the good faith exception applie[d]," since Officer Gruber testified he believed the area through the hole to be part of apartment 1.

As to Malcom's statements to law enforcement, the State noted that Malcom did not provide any evidence about "any coercion or anything that would make [his] statement[s] not voluntary." And the State presented evidence that law enforcement provided Malcom with a *Miranda* advisement.

The district court found that the "search was pursuant to the warrant" and Malcom's "statements were freely, voluntarily, knowingly, and intelligently given with the benefit of being made aware of his rights under Miranda and waiving them." It therefore denied Malcom's motion to suppress.

On April 27, 2022, Malcom filed a motion in limine, "mov[ing] the Court for an order limiting the mention of drugs or drug investigation during trial." The motion was later withdrawn.

## 2. TRIAL

A jury trial was held in May 2022. However, the jury was unable to reach a unanimous verdict and the district court declared a mistrial.

The second jury trial took place in July 2022. At trial, the parties stipulated to the fact that Malcom was a convicted felon at the time of the charged offense. Pumel, Officer Gruber, and Malcom testified at trial largely as they did at the March 2, 2022, hearing on the motion to suppress. There was additional testimony from other law enforcement officers, and numerous exhibits were received into evidence. We now set forth the evidence relevant to the issues on appeal.

### (a) Pumel's Testimony

Pumel testified that Malcom moved into apartment 1 in October 2020. At that time, another tenant was living in apartment 13. Pumel testified that the tenant moved out of apartment 13 in November 2020 (rather than in May 2021, as he testified at the suppression hearing). Pumel stated that he "got the key from her, . . . went in, [and] made a list of the things that [Malcom] needed to work on." He stated that there were "CD cases and stuff in the closet" and he instructed the prior tenant to empty the remaining items from the apartment. Shortly after, the prior tenant informed Pumel that she had emptied the apartment. Pumel stated that he then confirmed that the apartment was empty.

According to Pumel, when he checked apartment 13, he noticed that there was a "hole in the wall in between 13 and 1." He did not authorize Malcom to cut the hole in the wall and when asked what his reaction was when he saw the hole, he responded, "[i]t needed to get repaired." The State showed Pumel a photograph of the closet in apartment 13, which had the rifle bag containing the rifle in it, and asked him, "[t]hat was not in there at that time, correct?" Pumel responded, "No,

sir." When asked what he would have done if he found a rifle or a shotgun inside the closet, Pumel stated that he would have confiscated it and found out who it belonged to.

Pumel stated that he did not enter apartment 13 from November 2020, until June 24, 2021. He further testified that only he and Malcom had keys to apartment 13, and that he was not aware of anyone breaking into the apartment after November 2020. When asked whether he was aware of "any residents in [the apartment building] who owned a shotgun or anything like that," he responded, "No."

(b) Officer Gruber's Testimony

Officer Gruber testified similarly to his testimony at the suppression hearing regarding the anonymous tip and his subsequent surveillance on the apartment building. He described the traffic stops he made on two individuals, as well as noted that another LPD officer arrested an individual who made a short term stop at the apartment building and was found to be in possession of methamphetamine or a firearm.

Officer Gruber testified that he spoke with an individual who was leaving the apartment building who agreed to provide law enforcement information regarding various narcotics sales investigations. This individual informed Officer Gruber that "the residence they came from . . . was involved in the sales of methamphetamine" and that they had witnessed the individual who resided at the apartment building complete 50 narcotics transactions. The individual further informed Officer Gruber that a maintenance worker by the name "Fugi" placed a "tactical AR-15 rifle" in a hole in the wall behind a dresser and then brought his finger up to his lips to "shush[]" the individual.

Officer Gruber described being present on the property for a fire investigation on June 15, 2021, and his conversation with Malcom at that time. Through the open door to Malcom's apartment, he observed "needles and needle caps," as well as a "glass bulbless [sic] pipe which is commonly used to smoke methamphetamine."

Officer Gruber testified that he obtained a search warrant, which was executed on June 24, 2021. He seized several items from apartment 1, including "a single baggie of what looked to be methamphetamine" weighing 38 grams, "several items of drug paraphernalia" including "pipes, needles, things of that nature," and an ammunition belt containing 12-gauge shotgun shells. On cross-examination, Officer Gruber stated that the contents of the baggie were sent in for testing and "came back as not a controlled substance." Officer Gruber testified that he also searched apartment 13, where he found a green rifle case containing a functioning, loaded 12-gauge shotgun. He testified that the shotgun had a pistol grip and a sling, which is not typically found on hunting shotguns. The shotgun shells found in apartment 1 and in the shotgun were made by the same manufacturer.

Officer Gruber also testified about his interview of Malcom. According to Officer Gruber, Malcom stated that while he "allow[ed] other people to stay [in apartment 1] to stay out of the weather," he was the only person that consistently lived in the unit. Malcom denied ownership of the shotgun found in apartment 13 but stated that his fingerprints and DNA would probably be on the shotgun "because he move[d] things throughout the residence." Officer Gruber testified that he did not have the shotgun examined for fingerprints or DNA, even though it is "routine" to have such testing completed on a seized firearm.

### (c) Sergeant Brad Junker's Testimony

Sergeant Brad Junker testified that he worked for LPD and was on the SWAT team that cleared Malcom's apartment on June 24, 2021. When the team entered apartment 1, they saw a woman on the bed. Two SWAT team members went to the woman to maintain control of her. Sergeant Junker then found the hole in the drywall behind a piece of furniture that was partially blocking it. He stated that he "crouched down and . . . looked through th[e] hole" to see Malcom on the other side of the drywall with a "hatchet with an edged blade on his right hip." Sergeant Junker gave Malcom verbal commands to lower himself to the ground and lay on his stomach with his arms out to the side. Sergeant Junker then entered the room through the hole in the wall. Another officer followed and placed Malcom in handcuffs and took him into custody.

### (d) Malcom's Testimony

Malcom testified that on June 24, 2021, he lived in apartment 1. He stated that he had lived in the apartment building for "a year and a half, maybe two years" at that point, and specifically in apartment 1 for 6 months. He stated that in the early morning of June 24, he was completing various maintenance tasks throughout the apartment building, including fixing a ceiling fan in apartment 13. He stated that he entered apartment 13 from the exterior door and had been in there for 45 minutes to an hour before the execution of the search warrant.

Malcom testified that the prior tenant of apartment 13 had vacated the unit "around Christmastime" in 2021. He claimed the prior tenant and her adult children continued to have access to the apartment and "it seemed like things would come and go in there often." According to Malcom, the prior tenant stored items in the unit, including "a scooter and . . . a bunch of things in the closet."

When shown a photograph taken by law enforcement depicting a large hole in the wall, Malcom stated that the hole was smaller prior to the search on June 24, 2021. He claimed that from the apartment 13 side, "it was just a round hole that was probably maybe 2 feet by 2 feet, oblong shaped." From the apartment 1 side, he said there was a piece of drywall that had been removed before he moved into the unit and that he passed tools through the hole to apartment 13. He claimed that on the morning of the execution of the search warrant, "the dry wall was on the wall" and there was a dresser and other items against the wall. On cross examination, Malcom stated that the cut-out piece of drywall was leaned against the wall where it was cut, covering the hole on the apartment 1 side, but was not nailed into the wall. Malcom testified that the hole was larger after execution of the search warrant. When asked on cross-examination whether he was "saying the police removed th[e] dry wall," Malcom responded, "[t]hat would be my assumption."

Malcom testified that on June 24, 2021, he was not aware that there was a loaded shotgun in the closet of apartment 13. When asked why he was unaware of the shotgun, he stated that he did not "take inventory of all the things that were in there all the time." Malcom also denied having knowledge of the shotgun shells or the ammunition belt found near his bed. Malcom did not know to whom the shotgun belonged.

According to Malcom, when Officer Gruber asked him whether his DNA or fingerprints would be on the shotgun, he responded that his "DNA's probably all over th[e] building" since he was "the maintenance man." He characterized his response to Officer Gruber as "a flippant remark made out of frustration."

After deliberation, the jury found Malcom guilty of possession of a firearm by a prohibited person and the district court accepted the jury's verdict. At a sentencing hearing held on August 15, 2022, the court sentenced Malcom to 5 to 7 years' imprisonment. A written sentencing order was entered that same day.

Malcom appeals.

## III. ASSIGNMENTS OF ERROR

Malcom assigns that (1) there was insufficient evidence to support a jury verdict that he violated Neb. Rev. Stat. § 28-1206, possession of a firearm by a prohibited person, because a rational trier of fact could not find all elements of the offense beyond a reasonable doubt; (2) the district court erred in overruling his motion to suppress; (3) he received ineffective assistance of counsel when trial counsel failed to (a) present evidence of a firearms trace examination, (b) renew the motion to suppress and object to the admission of the evidence obtained pursuant to the search warrant, (c) attack the reliability or veracity of the statements from the CI in the search warrant affidavit, (d) object based on hearsay when Officer Gruber testified to statements made by a person leaving the apartment building during surveillance, (e) object based on hearsay when Officer Gruber testified to statements made by the CI, and (f) file a motion in limine to keep out any statements regarding drugs, narcotics, syringes, or methamphetamine; and (4) the court abused its discretion by imposing an excessive sentence.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Malcom argues that the evidence was insufficient to support his conviction of possession of a deadly weapon by a prohibited person. A person commits the offense of possession of a deadly weapon by a prohibited person if that person possesses a firearm, a knife, or brass or iron knuckles and has previously been convicted of a felony. § 28-1206. The parties stipulated that Malcom was

previously convicted of a felony offense. Thus, the remaining question is whether a rational fact finder could have determined that Malcom was in possession of a firearm, a knife, or brass or iron knuckles. There was no evidence that Malcom was in actual possession of the shotgun during the search at the apartment. We therefore consider whether the evidence supported his constructive possession of the shotgun.

The doctrine of constructive possession is applicable to the offense of possession of a deadly weapon by a prohibited person under § 28-1206. See *State v. Sherrod*, 27 Neb. App. 435, 932 N.W.2d 880 (2019). Constructive possession means the possessor did not have actual possession but was aware of the presence of the contraband and had dominion or control over it. *Id.* Constructive possession may be proved by direct or circumstantial evidence and may be shown by the accused's proximity to the item at the time of the arrest or by a showing of dominion over it. *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021). Mere presence at a place where the item in question is found is not sufficient to show constructive possession. *Id.*

Malcom argues that the only evidence presented at trial linking him "to the firearm [was] that he was in Apartment No. 13 when the search warrant was executed and where the firearm was found." Brief for appellant at 17. We disagree. Although Malcom correctly notes that mere presence at a place where a deadly weapon is found is not sufficient to show constructive possession, we find there was other evidence presented at trial sufficient to link Malcom to the shotgun.

First, it was undisputed that Malcom had a key to apartment 13, where the shotgun was found. In *State v. Sherrod, supra*, this court determined that the defendant's possession of a key to a bedroom where the contraband was located was sufficient to show that the defendant had constructive possession of the contraband. In reaching this conclusion, this court noted that the Eighth Circuit Court of Appeals "joined every other circuit in ruling that the holder of a key, be it to a dwelling, vehicle, or motel room in question, has constructive possession of the contents therein." See *id*. at 442, 932 N.W.2d at 888 (citing *U.S. v. Timlick*, 481 F.3d 1080 (8th Cir. 2007)).

Malcom argues that this case is distinguishable, because he "was not the only person with a key to Apartment No. 13." Brief for appellant at 17. He notes that Pumel also had a key and that it was contested at trial whether the prior tenant still had a key. However, when viewed in the light most favorable to the prosecution, the evidence supports a finding that the prior tenant did not have a key. There was also evidence that, although Pumel had access to the apartment, he had not entered the apartment since November 2020, and Pumel further testified that the former tenant had removed all property after moving out. We further note that constructive possession need not be exclusive. See *State v. Warlick*, 308 Neb. at 682, 956 N.W.2d at 293 ("[t]wo persons may have constructive possession, or one may have actual possession and the other have constructive possession").

There was also evidence that Malcom had access to the apartment through a hole in a wall shared by apartment 13 and apartment 1, where he resided. Sergeant Junker testified that the hole was large enough for SWAT team members to crawl through.

Further, at trial, Officer Gruber testified that, when interviewing Malcom, he asked Malcom whether "his fingerprints or DNA would be on the shotgun to which [Malcom] stated, probably, because he move[d] things throughout the residence." Officer Gruber also testified that the firearm found in the closet of apartment 13 was a 12-gauge shotgun which took 12-gauge

shells. LPD found an ammunition belt and drawstring bag containing 12-gauge shotgun shells next to Malcom's bed in apartment 1. The shells found in apartment 1 were made by the same manufacturer as the 12-gauge shells loaded in the shotgun found in apartment 13. All this evidence links Malcom to the shotgun.

In his brief on appeal, Malcom contests the evidence related to the shotgun shells, noting that at trial, he denied ownership of the shotgun shells found in apartment 1, "there [was] no picture provided of where those shotgun shells were located," and there was "no evidence that his fingerprints were on the firearm, the bag holding the firearm, or the shells." Brief for appellant at 17. He further notes that there was "no interview of the woman who was in Apartment No. 1 when the officers arrived," suggesting the shotgun shells could have been hers. *Id.*

In further argument that the evidence was not sufficient to support his conviction, Malcom criticizes law enforcement's investigation. Specifically, he criticizes law enforcement for the lack of body camera footage and "audio or visual recording of the interview of Malcom at the police station." *Id.* at 18. He further notes that the "gun was never sent to the lab for DNA testing" even though "Officer Gruber testified that it is his routine to send . . . firearm[s] to the lab every time one is seized." *Id.* He also argues that there was no photo of apartment 1 prior to the SWAT team moving the dresser. Finally, he claims that law enforcement failed to interview the other tenants in the apartment building and the "owner of the firearm discovered through the firearm trace." *Id.* Malcom's contentions regarding the shotgun shells and law enforcement's investigation relate to the weight and credibility of the evidence; however, it is not the role of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. See *State v. Figures, supra*.

We therefore find that the evidence presented at trial, viewed in the light most favorable to the prosecution, is such that a reasonable trier of fact could have concluded that Malcom had constructive possession of the shotgun.

## 2. MOTION TO SUPPRESS

Malcom claims the district court erred when it overruled his motion to suppress. He argues that his arrest was unlawful, law enforcement exceeded the scope of the search warrant, and the search was altogether unlawful because the warrant was issued on the basis of an affidavit which included information from a CI who Malcom contends was not established as reliable.

We agree with the State that Malcom failed to preserve this issue for appeal when he did not object to testimony at trial regarding evidence found during the execution of the search warrant or Malcom's statements to law enforcement following his arrest. In a criminal trial, after a pretrial hearing and order overruling a defendant's motion to suppress, the defendant, to preserve the issue on appeal, must object at trial to the admission of the evidence which was the subject of the suppression motion. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016). Regardless, we will reach this issue in our consideration of Malcom's claims of ineffective assistance of trial counsel.

## 3. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Malcom is represented by different counsel on direct appeal than he was at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must

raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide deficient performance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Anderson, supra*. The record on direct appeal is sufficient to review a claim of ineffective assistance of trial counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

With these governing principles in mind, we turn now to address Malcom's ineffective assistance of trial counsel claims.

(a) Failure to Present Evidence of Firearms Trace

Malcom claims he was denied effective assistance of counsel when trial counsel failed to offer into evidence a firearms trace which was entered into evidence at the first trial. The firearms trace showed that the shotgun was purchased by an individual whose address was in California. Malcom argued that "the firearms trace was clearly part of the trial strategy in the first trial, and it could be argued that it worked to a point since the jury did not reach a unanimous decision on guilt." Brief for appellant at 25. Malcom does not elaborate as to how the firearms trace was part of the trial strategy in the first trial.

We find that trial counsel's failure to introduce the firearms trace into evidence during the second trial does not constitute deficient performance since it is not relevant to the sole contested issue at trial. That the firearm was purchased by an individual in California 3 years prior to the offense does not make it more or less likely that Malcom was in possession of the firearm on the date the search warrant was executed. Further, even if trial counsel's decision not to offer this evidence at the second trial could be characterized as deficient, Malcom could not establish prejudice because, as we previously discussed, there was other evidence linking him to the firearm. Therefore, this claim of ineffective assistance of trial counsel fails.

- 11 -

Malcom argues that he received ineffective assistance when "trial counsel failed to object and renew the motion to suppress the evidence and statements obtained from the illegal search," thus failing to preserve the issue for appeal. *Id.* at 26. The motion to suppress asserted that certain evidence seized by law enforcement should be excluded at trial because the search exceeded the scope of the warrant. It also asserted that Malcom's statements to law enforcement should be suppressed because they were not made voluntarily or pursuant to a *Miranda* rights advisement.

### (i) Evidence Seized in Apartment 13

Regarding trial counsel's failure to object to the introduction of evidence found in apartment 13, this claim of ineffective assistance of counsel fails because the evidence was lawfully obtained. In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, appellate courts apply a two-part standard of review. See *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). Regarding historical facts, we review the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id.* And where the facts are largely undisputed, the ultimate question is an issue of law. *Id.*

At the hearing on Malcom's motion to suppress, Malcom argued that law enforcement exceeded the scope of the search warrant because they searched apartment 13 and seized items from that unit. In summary, Malcom's position was that, because the search warrant specifically ordered law enforcement to search apartment "#1" of the apartment building, law enforcement was not permitted to enter and search apartment 13. Therefore, Malcom claims the search of apartment 13 was unlawful and any items seized from apartment 13 were inadmissible at trial. The State argued that the search warrant contemplated apartment 13 because the underlying affidavit mentioned the hole in the wall of apartment 1 and the possibility that contraband was being hidden in the hole. The State also argued that law enforcement acted in good faith when searching apartment 13 because it believed the unit to be part of apartment 1. Therefore, the good faith exception to the exclusionary rule applied.

The district court found "that the facts [we]re as testified to by Officer Gruber as well as Mr. Pumel, whose testimony [the court] found in both instances to be credible in all respects." We find no clear error in the court's historical findings of fact. Based on the evidence presented, the court concluded "that the search was pursuant to the warrant and that the hole in the wall and the evidence beyond that hole to be within the scope of that warrant and also in plain view."

Although the parties dedicate much of their arguments on appeal to whether apartment 13 was part of apartment 1 and therefore within the scope of the warrant, we need not address that argument because we find that to the extent that law enforcement's search exceeded the scope of the search warrant, they did so in good faith. The good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite a magistrate's authorization. *State v. Kruse*, 303 Neb. 799, 931 N.W.2d 148 (2019). Officers are assumed to have a reasonable knowledge of what the law prohibits. *Id.* In assessing the good faith of an officer conducting a search warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit. *Id.*

Law enforcement's conduct and discoveries made in the process of executing the search warrant in this case weigh in favor of finding good faith. Officer Gruber testified that, when executing the search warrant, he believed the area through the hole in the wall to be part of apartment 1. He stated this belief was based upon information he had obtained from the CI that the area through the hole was used for storing illegal substances and firearms. This information was contained in the underlying affidavit to the search warrant. Officer Gruber testified that LPD was also aware that the hole had previously been used for people to escape detection by law enforcement.

Officer Gruber further testified that apartment 1 is a single room with no bathroom or kitchen. When clearing the unit, the SWAT team moved a dresser in the room, exposing the hole in the wall, through which Malcom was located. The hole was large enough for officers to crawl through. Upon entering the area through the hole, it was discovered that the area consisted of a "main room," a kitchen, a bathroom, and an additional room with a closet. A photograph of the apartment received into evidence at the suppression hearing showed that the closet where the shotgun was found did not have a door, making the contents of the closet plainly visible. The area had a door which led to the outside of the apartment building. Unlike the other units in the apartment building, the doors to apartments 1 and 13 were not marked with apartment numbers.

Thus, while the language of the search warrant provided that the premises to be searched included apartment "#1," it was unclear to law enforcement when executing the search what constituted apartment 1. Since apartment 1 consisted of merely a single room with no bathroom or kitchen, it was reasonable for law enforcement to believe that the unit was part of a larger apartment unit consisting of additional rooms. There was nothing indicating to law enforcement that apartment 13 was a separate unit, since the unit was not marked with an apartment number at the time. Further, law enforcement was aware that apartment 1 extended to some degree through the hole in the wall, since they were aware that individuals were possibly using the area through the hole in the wall to escape searches by law enforcement and hide contraband. Given the overall context of this search, we find law enforcement's conduct to be covered by the good faith exception. Therefore, the evidence found in apartment 13 was lawfully obtained.

### (ii) Malcom's Statements to Law Enforcement

As to Malcom's statements to law enforcement, the district court found that they "were freely, voluntarily, knowingly, and intelligently given with the benefit of being made aware of his rights under Miranda and waiving them."

To be a valid waiver of *Miranda* rights, the waiver must be knowing and voluntary. See *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). A waiver is knowing if it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. See *id.* A waiver is voluntary if it is the product of a free and deliberate choice rather than through intimidation, coercion, or deception. See *id.* The standard for determining voluntariness in the context of a *Miranda* waiver is the same standard used to determine the voluntariness of confessions. *Id.* Whether a knowing and voluntary waiver has been made is determined by looking to the totality of the circumstances. *Id.*

As we previously stated, we find no clear error in the district court's historical findings of fact. We further find that the record establishes that trial counsel was not deficient in failing to

object to Malcom's statements to law enforcement presented at trial because Malcom validly waived his *Miranda* rights prior to making the statements to law enforcement.

Malcom's waiver was made knowingly since he received a complete advisement of his *Miranda* rights from Officer Gruber. Officer Gruber testified at the suppression hearing that before beginning the interview, he informed Malcom "why [they] were there and that [he] would like to speak with [Malcom]." He then advised Malcom of his rights utilizing a "Miranda Warning and Waiver" form which contained the following six typewritten questions:

Q. I would like to advise you that I am a Police Officer. Do you understand that?

Q. You have the right to remain silent and not make any statements or answer any of my questions. Do you understand that?

Q. Anything you may say can be, and will be, used against you in a court of law. Do you understand that?

Q. You have the right to talk to a lawyer before answering any questions and have the lawyer with you during the questioning. Do you understand that?

Q. If you cannot afford a lawyer, you have the right to have a lawyer appointed for you prior to questioning, at no cost to you. Do you understand that?

Q. Knowing your Rights in this matter, are you willing to answer questions or make a statement to me now?

Officer Gruber testified that he read each question to Malcom and handwrote Malcom's corresponding answers in the blank spaces beneath each question on the form. Malcom answered "Yeah" to each question. Malcom's signature appears at the bottom of the form. Officer Gruber testified that during the interview, Malcom "appeared normal" and did not appear to be under the influence of alcohol or narcotics; rather, he appeared to be alert and followed Officer Gruber's questions.

The record also shows that Malcom's waiver was made voluntarily. Malcom was not handcuffed during the interview and Officer Gruber testified that he did not make any promises to Malcom to get him to provide a statement, nor did he use any force or threat of violence to get Malcom to waive his *Miranda* rights. Malcom did not introduce any evidence at trial contesting Officer Gruber's testimony, nor does he claim on appeal that such evidence exists. Rather, he merely reiterates his argument from the suppression hearing that Officer Gruber's failure to capture the interview by body camera or timely save the interview room recording of the interview somehow suggests wrongdoing on the part of law enforcement. However, when Malcom provided testimony regarding the interview at the suppression hearing, he did not testify that law enforcement engaged in any such misconduct. In fact, when asked whether he was "given the Miranda Warning sheet," he responded "Yes, sir." Malcom also does not assert any facts on appeal that would suggest he did not knowingly and voluntarily waive his *Miranda* rights.

We therefore find that Malcom's trial counsel was not deficient for failing to object to the introduction of evidence obtained under the search warrant or to Malcom's statements given to law enforcement because such objections would have failed. This claim of ineffective assistance of trial counsel fails. See *State v. Devers*, 313 Neb. 866, 986 N.W.2d 747 (2023) (counsel cannot be ineffective for failing to raise meritless argument).

## (c) Failure to Attack Reliability of CI

Malcom argues that he received ineffective assistance when trial counsel "failed to attack the reliability or veracity of the [CI]" at the suppression hearing. Brief for appellant at 26. He claims that the affidavit failed to meet the standard for sufficiency of an affidavit in support of a search warrant which relies upon the strength of a CI's information because it did not "identify any information to show that the [CI] is reliable." *Id.* at 27. He contends that had trial counsel adequately challenged the reliability of the CI, Malcom's motion to suppress would have been granted and the firearm seized during the search would have been excluded at trial.

The record establishes that trial counsel was not deficient for failing to challenge the adequacy of the affidavit because the affidavit contained information sufficient to establish the credibility of the CI. When a search warrant is obtained on the strength of an informant's information, the affidavit in support of the issuance of the warrant must (1) set forth facts demonstrating the basis of the informant's knowledge of criminal activity and (2) establish the informant's credibility, or the informant's credibility must be established in the affidavit through a police officer's independent investigation. *State v. Hidalgo*, 296 Neb. 912, 896 N.W.2d 148 (2017). These two prongs are not accorded "independent status," but, rather, are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. *Id.* at 918, 896 N.W.2d at 153.

The reliability of an informant may be established by showing in the affidavit to obtain a search warrant that (1) the informant has given reliable information to police officers in the past, (2) the informant is a citizen informant, (3) the informant has made a statement that is against his or her penal interest, and (4) a police officer's independent investigation establishes the informant's reliability or the reliability of the information the informant has given. See *id.* An affidavit in support of the issuance of a search warrant must affirmatively set forth the circumstances from which the status of the informant can reasonably be inferred. *Id.*

Here, the affidavit set forth facts demonstrating the basis of the CI's knowledge of criminal activity. Specifically, it stated that the CI had been present in Malcom's apartment every day for a month. During that time, the CI witnessed over 50 drug transactions take place and saw Malcom in possession of a firearm. The affidavit also established the CI's credibility through Officer Gruber's independent investigation of the activities taking place at the apartment building. Officer Gruber stated in the affidavit that he had observed "short term traffic . . . consistent with drug sales" and found methamphetamine on two separate individuals who each entered the apartment building for a short period of time. He also observed drug paraphernalia in Malcom's apartment unit when he entered the apartment building for an unrelated call for service. This all suggested the presence of controlled substances in Malcom's apartment and that he was selling such substances. Officer Gruber also knew that the individual living in apartment 1 was Malcom, the maintenance worker for the apartment building. The information provided to Officer Gruber by the CI largely aligned with the information Officer Gruber had obtained through his own independent investigation, demonstrating the reliability of the CI.

Malcom notes that the affidavit did not show that certain portions of the CI's tip were verified by law enforcement. For example, he states that there is "no mention in the search warrant affidavit as to whether Officer Gruber had seen this [CI] in the apartment building before or whether he had even seen a male with short [dreads] to corroborate the information from the [CI]." Brief for appellant at 27. However, the entire tip need not be corroborated or verified by law enforcement to justify probable cause for a search warrant. See *State v. Hidalgo, supra* (finding that anonymous tip was sufficiently supported by law enforcement investigation, even when not all details of tip were confirmed by investigation). This claim of ineffective assistance of trial counsel fails.

(d) Failure to Object to Hearsay

Malcom assigns that he received ineffective assistance when trial counsel failed to object to Officer Gruber's testimony regarding out of court statements made by a "person leaving the apartment building during surveillance" and "statements made by a confidential informant." Brief for appellant at 10. On our review of the record, it appears that the "person leaving the apartment building," *id.*, is the same individual as the CI. As noted by the State, "While Officer Gruber testified he stopped people leaving the building as part of his independent investigation, the only statements of such a person that were mentioned during the second jury trial were those made by the CI." Brief for appellee at 33. We agree that Officer Gruber's testimony at trial about his conversation with the person who left the apartment building matches the content of his affidavit regarding information received from the CI. We therefore discuss these assigned errors as one.

Malcom argues that Officer Gruber's testimony regarding the CI's statements was "highly prejudicial," because "Malcom had no way to counter it or cross examine the individual who made the alleged statement to Officer Gruber." *Id.* at 28. Malcom specifically takes issue with Officer Gruber's testimony regarding the CI's statements about drug sales and the presence of a firearm in Malcom's apartment. However, as noted by the State, even if trial counsel had objected to this testimony, the State could have argued it was not hearsay because it was not being offered to prove the truth of the matter asserted. Rather, "the CI's statements were only offered to provide context as to why a search warrant was being executed at that residence." Brief for appellee at 33. We agree.

If an out-of-court statement is not offered for the purpose of proving the truth of the facts asserted, it is not hearsay. See *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010). In this case, the challenged testimony was provided not to prove the truth of the CI's statements, but to explain why a search warrant was obtained. But even if trial counsel was somehow deficient for not making a hearsay objection, Malcom would not be able to establish prejudice. The fact that Officer Gruber was permitted to testify about the CI's observations about matters within the apartment, along with other investigative measures taken to support the issuance of a search warrant, did not prejudice Malcom's defense, particularly since Malcom himself testified. Malcom did not deny the presence of the shotgun in apartment 13; rather, his defense was that it was not his gun, that he was not aware of its presence, and that he was only in apartment 13 for maintenance matters. The jury was able to consider Malcom's testimony and weigh it against other evidence, such as the ammunition belt and drawstring bag containing 12-gauge shotgun shells next to Malcom's bed in apartment 1, which were made by the same manufacturer as the 12-gauge shells loaded in the shotgun found in

apartment 13, and the fact that only Malcom and Pumel had keys to that apartment. Malcom would be unable to demonstrate a reasonable probability that but for trial counsel's alleged deficient performance as to this claim, the result of the proceeding would have been different. This claim of ineffective assistance of trial counsel fails.

### (e) Failure to File Motion In Limine

Malcom contends that he received ineffective assistance of counsel when trial counsel "failed to file a motion in limine to keep out any statements regarding drug sales or surveillance of possible drug sales." Brief for appellant at 29. He notes that trial counsel filed a motion in limine requesting that the district court limit the mention of drugs and the drug investigation, but later withdrew the motion during the first trial and never renewed or refiled it prior to the second trial. Malcom argues that there was no reason to mention drugs and that "[d]rugs are by nature considered bad things and associated with criminals." *Id.* at 30.

The State contends that Malcom cannot show deficient performance or prejudice because "the drugs were intrinsic evidence of the firearm offense." Brief for appellee at 34. The State points to *United States v. Cunningham*, 702 Fed. Appx. 489 (8th Cir. 2017) where "drug-related evidence was found to be properly admissible as intrinsic to the offense charged of felon in possession of a firearm because it provided context and background for the gun charge, as well as a motive for possessing the firearm." Brief for appellee at 34. See, also, *United States v. Claxton*, 276 F.3d 420 (8th Cir. 2002) (no abuse of discretion where district court admitted evidence of drug-related activities during trial on felon-in-possession charge, given close and well-known connection between firearms and drugs). We agree that intrinsic evidence is admissible to provide context in certain circumstances, and that the testimony about drugs in this case was necessary to provide the full story for why the search warrant was obtained, which ultimately led to the discovery of the shotgun. See *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012) (intrinsic evidence or evidence necessary to tell complete story of crime is admissible to provide context in which crime occurred). But even if trial counsel was somehow deficient for withdrawing the motion in limine, Malcom would be unable to establish prejudice. Regarding the drugs located in apartment 1, Officer Gruber stated that the contents of the baggie were sent in for testing and "came back as not a controlled substance." Further, although testimony about drugs provided a basis for securing a search warrant, the jury was tasked only with determining whether the shotgun was constructively possessed by Malcom. We have already addressed the sufficiency of the evidence on that issue and conclude that Malcom cannot demonstrate the outcome of his trial would have been different had the jury never heard about drugs suspected of being sold out of apartment 1. We find this claim of ineffective assistance also fails.

### 4. EXCESSIVE SENTENCE

Malcom claims the district court abused its discretion when it imposed an excessive sentence. Malcom was convicted of one count of possession of a firearm by a prohibited person, a Class ID felony. A Class ID felony is punishable by a mandatory minimum of 3 years' imprisonment and up to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022). The court sentenced Malcom to 5 to 7 years' imprisonment. Malcom's sentence is within the

statutory range; as such, we review the court's sentencing determination only for an abuse of discretion.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Malcom was 43 years old at the time of sentencing. According to the presentence investigation report (PSR), Malcom was married and had no dependents. He obtained his GED and worked in building maintenance prior to his incarceration.

Malcom's criminal history dating back to 1997 includes numerous convictions for possession of marijuana, several convictions related to firearms, a couple "DUI" convictions, a couple assault-related convictions, and more. A "Level of Service/Case Management Inventory" assessed Malcom as a very high risk to reoffend.

The PSR included a letter from trial counsel, wherein trial counsel emphasized that Malcom had spent 416 days incarcerated since his arrest in June 2021. He further noted that Malcom took "responsibility for his predicament" and acknowledged that "he should have been more cognizant of his surroundings and the potential he had from criminal charges of a firearm being found at or near him." At the sentencing hearing, trial counsel reiterated that Malcom had taken responsibility for his actions. Malcom declined to address the district court when given the opportunity.

The State noted that the present offense was Malcom's "fourth conviction for firearms violations." It further pointed out that the shotgun found to be in his possession was a "tactical-style shotgun that had a pistol grip." The State emphasized that it was "slung loaded so that it could be carried . . . straight down from a person's chest. It wasn't carried shoulder style like a hunter would carry a shotgun." Further, Malcom had 82 rounds of ammunition. The State argued that this "created a substantial risk to our community."

The district court stated that it had taken into consideration all the information in the PSR, the information gleaned from the trials, and trial counsel's comments. It found the present offense to be serious and said that it was concerning that this was Malcom's fourth firearms related conviction. The court found that imprisonment was necessary for the protection of the public and because the risk was so substantial Malcom would engage in additional criminal conduct during a period of probation and a lesser sentence would depreciate the seriousness of Malcom's crime and promote disrespect for the law. The court then sentenced Malcom as previously set forth.

In his brief on appeal, Malcom claims that the district court abused its discretion by failing to consider the lack of violence involved in his offense. He acknowledges that while a sentence must be fashioned to deter others, it should also rehabilitate the defendant. He argues that while "any case involving a weapon can be considered a serious offense," the court could have "deterred others with a sentence of time served." Brief for appellant at 32.

We find no abuse of discretion by the district court in sentencing Malcom. First, we note that Malcom's crime was subject to a mandatory minimum of 3 years' imprisonment; thus, time served would not have been appropriate. Furthermore, because the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). To the extent Malcom argues that the court did not adequately consider certain mitigating factors, we note that it is evident that the court had before it all the information that Malcom suggests should have resulted in a lesser sentence. However, it was within the sentencing court's discretion to weigh more heavily the factors supporting a lengthier sentence, such as the seriousness of the offense and Malcom's history of similar criminal activity. We therefore cannot say the court abused its discretion in determining the sentence imposed.

## VI. CONCLUSION

For the reasons set forth above, we affirm Malcom's conviction and sentence. We further conclude that the record before us is sufficient to address all of Malcom's claims of ineffective assistance of trial counsel and we find that they all fail.

AFFIRMED.