IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. STEFFENS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

RYAN A. STEFFENS, APPELLANT.


Filed January 23, 2024.    No. A-23-343.


Appeal from the District Court for Cheyenne County: DEREK C. WEIMER, Judge. Affirmed.

Donald J.B. Miller, Cheyenne County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.


PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Cheyenne County District Court, Ryan A. Steffens was convicted of terroristic threats and operating a motor vehicle to avoid arrest. Steffens appeals, claiming the district court erred when it admitted unfairly prejudicial testimony, failed to declare a mistrial based on the admission of such testimony, determined an 8-year-old witness was competent to testify, and denied his motion for a directed verdict. Steffens further claims there was insufficient evidence to support his conviction of terroristic threats. We affirm.

## II. BACKGROUND

### 1. SEPTEMBER 17, 2022, INCIDENT

In the late afternoon of September 17, 2022, Steffens went to the home of his ex-wife, Shauna Russell, without any advanced notice to her. Earlier in the week, Steffens told Russell they were not friends and there should be no contact between them besides talking about their

8-year-old daughter, K.S. On September 17, Steffens parked his pickup in Russell's driveway and remained in his vehicle. Russell was inside with K.S. when she saw Steffens' pickup in her driveway. Russell and K.S. went outside to their back porch to investigate. Steffens asked Russell to call his cellphone because he had lost it. K.S. called Steffens' cellphone while Russell made "small talk" with Steffens. Russell asked Steffens if his dog was with him, to which he responded that someone named "Johhny Hajek" was with him. This confused Russell and made her uneasy because it did not appear anyone else was with Steffens. K.S. kept calling Steffens' phone, but he did not appear to be looking for it. Russell believed Steffens was "under the influence" at the time because of his mannerisms, slurred words, and the confusion. Steffens subsequently "threw his hands into the air" and drove across Russell's yard. This alarmed Russell, so she took K.S. back into the house and locked the back door and front door, located her cellphone, and called her boyfriend who was hunting nearby. Russell saw Steffens at the back door where he "started radically banging on it." She then took K.S. to Russell's bedroom where she locked that door and called 911. Russell heard loud banging on the front door, and she believed she was "going to die" when the door was kicked in. However, she then heard a vehicle leave the property. When her boyfriend arrived, he observed Steffens' pickup leaving the driveway.

While one law enforcement officer investigated matters at Russell's home, another proceeded to Steffens' residence for questioning. While in sight of Steffens' residence, law enforcement observed a pickup heading out from the residence. When law enforcement activated the vehicle's emergency overhead lights and siren while following the pickup, which was believed to be driven by Steffens, the vehicle failed to stop. After traveling at speeds up to "about 65 miles an hour," it was decided to "terminate the pursuit" for community safety.

## 2. PRETRIAL PROCEEDINGS

On October 5, 2022, the State filed an information with the district court charging Steffens with two counts: count 1, terroristic threats, pursuant to Neb. Rev. Stat. § 28-311.01(a) or (c) (Reissue 2016), a Class IIIA felony; and count 2, operating a motor vehicle to avoid arrest, pursuant to Neb. Rev. Stat. § 28-905(1) (Reissue 2016), a Class I misdemeanor.

On February 13, 2023, Steffens filed a motion in limine requesting that the district court exclude certain evidence at trial, including the testimony of his 8-year-old daughter, K.S., and any evidence related to a separate pending criminal case against him. At a pretrial hearing held on February 14, Steffens' counsel clarified that the separate criminal case was for charges involving Steffens' violation of protection orders against him, and that he was requesting the court also exclude any evidence related to the protection orders. Following the hearing, the court entered an order permitting the State to elicit testimony at trial that the protection orders were sought and granted, so long as no testimony was given regarding any alleged violation of the protection orders. The court also restricted the State from introducing the petitions for the protection orders or the protection orders themselves. The court reserved ruling on the issue of K.S.' testimony until trial, when it would make a competency determination prior to the State examining the witness.

## 3. TRIAL

A jury trial was held on March 8 and 9, 2023. Russell, her boyfriend Nathan Juhl, K.S., and two law enforcement officers testified on behalf of the State.

## (a) Russell's Testimony

Russell testified consistent with portions of the background provided previously. She also testified about her divorce from Steffens, describing their relationship as "[d]ecent." She stated that they tried "to keep life for [their daughter] normal" and that she allowed Steffens to spend significantly more time with K.S. than was required by their parenting plan. However, in the week before the September 17, 2022, incident, Steffens called and told Russell he was not friends with her or Juhl, and that they should have no contact besides talking about their daughter. This conversation was uncomfortable and put Russell on "edge" because they had been friendly until then and she did not know what had changed.

Russell testified that September 17, 2022, had been Steffens' and her wedding anniversary. Steffens did not have parenting time scheduled that day with their daughter and had no reason to be at her house. It was not common for Steffens to come to her house uninvited. She heard the dog bark and saw Steffens parked in the driveway. As previously noted, she and K.S. went outside to the back porch to investigate and when Steffens drove across her yard, she went inside, locked the doors, and called Juhl and 911. Russell said she did this because she was scared of Steffens. She heard "[f]ive or six loud bangs, shaking the house" and then "the front door was kicked in." She stated that she felt threatened when the door was kicked in and she believed she was "going to die." When Russell left her bedroom after Juhl and law enforcement arrived, she discovered that the front door had been forced open and damaged. When asked on cross-examination whether during the incident Steffens ever said he was going to hurt her or kill her, Russell responded, "No." She stated that Steffens did not verbally threaten her, nor did he show her a weapon of any kind.

After the incident, she sought a protection order against Steffens for herself and her daughter because she believed their lives were in danger. Steffens' objection to this testimony was overruled. On cross-examination, Russell stated that prior to the September 17, 2022, incident, Steffens had never been violent with her or their daughter.

Russell also explained that this incident had nothing to do with Steffens not finishing the painting of her house, nor was it related to an incident involving Steffens' brother. Russell and Juhl had hired Steffens to paint their house in the spring of 2022 through July 2022. However, the project was not finished because Juhl became stern with Steffens' brother when Steffens' brother spilled primer on a cedar porch after Juhl instructed him not to paint in the area until it was covered with tarps. Russell denied that this incident created issues between Steffens and her. When asked whether the painting job being unfinished had anything to do with why she was testifying that day, Russell responded, "No."

## (b) Juhl's Testimony

Juhl testified regarding the incomplete painting project, the events of September 17, 2022, and the protection orders. He said that when Steffens was working on the painting project, he sometimes stayed over for drinks and supper with Juhl and Russell after completing his work for the day. Steffens did not complete the painting job because Juhl raised his voice at Steffens' brother when he spilled primer on Juhl's cedar porch. Juhl was disappointed that Steffens did not complete the project because he then had to complete the project himself. When asked whether he was testifying as revenge for the unfinished paint job, he responded, "No."

On September 17, 2022, after receiving Russell's call and arriving at the house, Juhl saw Steffens' pickup leaving the driveway of their property. Juhl ran inside to make sure that Russell and K.S. were okay. He observed that the "front door was hanging open and had been broken open" and that it was not broken before he left the house to go hunting.

Juhl testified that after the incident, he sought a protection order against Steffens. Steffens' objection to the testimony was overruled. Juhl sought a protection order because he was "scared that [Steffens] would come back" and "maybe do more harm."

### (c) Motion for Mistrial

Following Juhl's testimony, Steffens' counsel moved for a mistrial, stating that the testimony related to Russell's and Juhl's protection orders unfairly prejudiced Steffens. The State opposed the motion, noting that the State had not offered the protection orders as evidence, but merely elicited testimony that Russell and Juhl sought to obtain protection orders against Steffens. The district court overruled the motion for mistrial "on the basis of the ruling that was previously made in the motion in limine."

### (d) Law Enforcement Officers' Testimony

A sergeant from the Cheyenne County sheriff's office testified that he responded to Russell's September 17, 2022, request for emergency assistance. When he arrived at the house, he observed tire marks in the driveway "indicative of a vehicle spinning its tires." He stated that the tire marks were consistent with what Russell had told him regarding Steffens leaving the property "at a high rate of speed." The sergeant further observed that there were markings on Russell's front door, and that the door had been damaged. The State introduced into evidence photographs taken by the sergeant which depicted the damage to the door. One photograph showed that the "striker of the doorknob assembly" was no longer attached to the door. Another photograph showed the door was "bowed to the outside" and had a large crack in it. The sergeant further testified that the markings and damage he observed were consistent with a door being forcibly opened.

A deputy from the sheriff's office testified that he was one of the officers who responded to the September 17, 2022, incident. When he learned Steffens had left Russell's property, he began looking for him. While in sight of Steffens' residence, the deputy observed a pickup heading out from the residence. When the deputy activated his vehicle's emergency overhead lights and siren while following the pickup, which he believed to be driven by Steffens, the vehicle failed to stop. After traveling at speeds up to "about 65 miles an hour," it was decided to "terminate the pursuit" for community safety. When the deputy had a phone conversation with Steffens later the same evening, there was a lot of road noise in the background. When the deputy told Steffens they needed to talk about Steffens "fleeing" from the deputy, Steffens asked what evidence there was of that. When the deputy told Steffens they needed to talk about the incident at Russell's residence, Steffens asked what evidence there was of that. The deputy asked Steffens to "stop or roll up a window or something so [the deputy] could talk to him better because it was difficult to understand him," however, the conversation was terminated at that time.

The district court interviewed K.S. outside the presence of the jurors. She informed the court that she would be turning 9 years old soon and that she was in third grade. Although she knew the name of her school, she did not know the school district's name, which the court conceded may have been a "bad question to ask." K.S. stated that her favorite class was Math.

The following colloquy took place between the district court and K.S.

THE COURT: . . . who is your mom?

[K.S.]: Shauna.

THE COURT: What's your last name?

[K.S.]: Russell.

THE COURT: And who is your dad?

[K.S.]: Ryan.

THE COURT: Was [sic] his last name?

[K.S.]: Steffens.

The district court asked K.S. various questions regarding her moral duty to tell the truth. When asked whether she knew the difference between telling the truth and a lie, K.S. stated, "Not really." The following colloquy then took place.

THE COURT: If I asked you if it's Christmas today, what would you say?

[K.S.]: That's a lie.

THE COURT: If I told you I was sitting here in an orange robe, is that the truth or is that a lie?

[K.S.]: That's a lie.

THE COURT: So, if you tell a lie do you get in trouble?

[K.S.]: No, not too much.

THE COURT: Okay, do you get corrected?

[K.S.]: Yeah.

THE COURT: And who corrects you?

[K.S.]: Like a parent.

. . . .

THE COURT: And did you try to do the things that you [sic] said to you to correct those decisions or those things?

[K.S.]: Yes.

THE COURT: So, if dad said [K.S.] I don't think that's true and you said, you're right and he gave you some sort of consequence, did you do what he wanted you to do?

[K.S.]: Yes.

THE COURT: I [will] ask you here in a minute to promise to tell me the truth, to tell [the State] the truth, to tell [Steffens' counsel] the truth, to tell your dad the truth, will you do that?

[K.S.]: Yes.

THE COURT: Do you promise?

[K.S.]: Yes.

The district court then provided the State and Steffens' counsel the opportunity to ask K.S. questions. The State declined, but Steffens' counsel asked K.S. if she remembered when they talked a few weeks ago and she answered a "bunch of questions." K.S. indicated she remembered. Steffens' counsel asked if she remembered what she said when she was asked about her favorite class. K.S. responded that she said at that time that she did not have a favorite class. When asked why she was now telling the judge something different, she responded, "Because math just got a lot funer [sic] for [her] now."

The district court then indicated that it had reviewed *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997), and was satisfied that K.S. was "able to answer the questions that were suggested in that case." The court stated that it found K.S. to be competent to testify in the proceedings. The court then welcomed Steffens' counsel to "offer into the record [his] concerns" regarding K.S. testifying. Steffens' counsel stated:

> [T]he deposition was taken on February 9th, so about a month ago. I don't believe that [K.S.] appreciates the moral duty to tell the truth. I asked that same question to her just a few weeks ago and her answer was she had no specific class that she had a favorite of. The court ask[ed] her questions about if she knows the difference between telling the truth and telling a lie, although it was difficult to hear I thought she said no that she didn't know the difference. She had difficulties answering questions regarding the school system. I don't think she appreciates the moral duty to tell the truth. I also have concerns about her ability to accurately receive information and to relate it accurately. So, we renew our objection that [K.S.] is not a competent [witness].

The district court overruled Steffens' objection. The State then proceeded to examine K.S. in the presence of the jury.

### (f) K.S.' Testimony

K.S. testified that she lived with Russell and Juhl, and that on September 17, 2022, she was home with Russell when her father arrived at the house and asked her to call his cellphone. She did not expect to see Steffens that day. She said that Russell "locked the back door and the front door because [Steffens] went to the back where there is no driveway and [they] went into the bedroom." She stated that her mother "just had a bad feeling in her gut" and that "something bad in her gut would go wrong." K.S. heard Steffens knocking "on the front door a couple of times and then the back and . . . then [they] thought he was kicking or something on the front door." She testified that the door broke, and when asked how she felt when that was happening, K.S. replied, "Scared." K.S. stated that Juhl came home right after her father left.

On cross-examination, Steffens' counsel again questioned K.S. about changing her answer about her favorite class between the time of her deposition and trial. K.S. explained that some classes "got a little bit harder and math easier for some reason." K.S. confirmed that she and her mother saw her father at the back door knocking. K.S. said she missed her father "[a] little bit" and that she loved him.

### (g) Jury Verdicts and Sentences

Following K.S.' testimony, the State rested its case. Steffens' counsel then moved for a directed verdict, stating that there was "insufficient evidence of a terroristic threat." The State opposed the motion. The district court overruled the motion and stated that it would allow the jury to decide the case. Steffens' counsel informed the court that the defense was not putting on a case and rested. Closing arguments were made to the jury. After deliberation, the jury found Steffens guilty of terroristic threats and operating a motor vehicle to avoid arrest. In an order entered on March 9, 2023, the court accepted the jury's verdict. On April 6, Steffens was sentenced to 365 days in jail on the terroristic threats conviction and 30 days on the operating a motor vehicle to avoid arrest conviction, with the sentences to be served concurrently.

Steffens appeals.

## III. ASSIGNMENTS OF ERROR

Steffens assigns, restated, that the district court erred when it (1) allowed the testimony regarding protection orders because it was "unfairly prejudicial," (2) failed to grant a mistrial following admission of the protection order testimony, (3) determined K.S. was competent to testify, and (4) failed to direct a verdict at the close of the State's case when the prosecution failed to present evidence that a threat had been communicated to the victim. He further assigns that (5) there was insufficient evidence to support a conviction for the charge of terroristic threats.

## IV. STANDARD OF REVIEW

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably for the State, is sufficient to support the conviction. *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

## V. ANALYSIS

### 1. Admission of Protection Order Testimony

Steffens argues that Russell's and Juhl's testimony that they had obtained protection orders based upon the September 17, 2022, incident, was not relevant and was unfairly prejudicial to Steffens. He argues that the "protection order evidence . . . did not make the existence of a material fact at issue any more or less likely." Brief for appellant at 13. Further, he claims the testimony unfairly prejudiced Steffens because it is "commonly known among the general public that

protection orders are issued by judges." *Id*. at 14. Therefore, the issuance of the protection orders "clearly indicated to the jury that a judge had looked at this incident and found sufficient evidence to warrant an order of protection to be issued against . . . Steffens." *Id*. He suggests that "[e]ven if there was some relevance to th[e] testimony, its prejudicial effect substantially outweigh[ed] its probative value." *Id*.

### (a) Relevance

To evaluate the relevance of the testimony regarding Russell and Juhl seeking protection orders after the September 17, 2022, incident, we consider the elements for proving a terroristic threat under § 28-311.01, which states:

> (1) A person commits terroristic threats if he or she threatens to commit any crime of violence:
> (a) With the intent to terrorize another;
> (b) With the intent of causing the evacuation of a building . . . ; or
> (c) In reckless disregard of the risk of causing such terror or evacuation.

Russell testified that she sought a protection order because she felt their "lives were in danger" and Juhl stated that they were "concerned" and "scared that [Steffens] would come back, maybe do more harm." This evidence goes to whether Russell experienced terror as a result of Steffens' actions on September 17. Thus, the testimony was relevant to the issue of whether Steffens made a terroristic threat. See *State v. Hernandez, supra* (to be relevant, evidence must be probative and material; it is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence, and it is material if it is of consequence to the determination of the case).

### (b) Prejudice

Steffens correctly argues that even relevant evidence must pass muster under Neb. Rev. Stat. § 27-403 (Reissue 2016). See *State v. Hernandez, supra* (relevant evidence is not automatically admissible; it must pass muster under rule 403). Rule 403 provides that the probative value of evidence must not be substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury." § 27-403. "Rule 403 considers the danger of *unfair* prejudice." *State v. Hernandez*, 299 Neb. at 922, 911 N.W.2d at 545 (emphasis in original). "Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party." *Id*. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis and speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. See *State v. Hernandez, supra*.

Steffens suggests that the testimony was unfairly prejudicial because it would have lured the jury to declare his guilt based upon a court's issuance of the protection orders in a separate case, rather than on the evidence before the jury. However, as the State points out, the only testimony given regarding the protection orders was that Russell and Juhl sought them, not that a court granted them. There was no testimony or other evidence indicating that the protection orders were actually issued, and thus there was no indication that a judge previously considered the

- 8 -

incident and found sufficient evidence to issue a protection order. Therefore, contrary to Steffens' argument, a jury could not have been lured into declaring his guilt on this basis.

### 2. DENIAL OF MOTION FOR MISTRIAL

Steffens next argues that the district court "erred by failing to grant a mistrial following the admission of the testimony regarding protection orders." Brief for appellant at 4. A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Schmaltz*, 304 Neb. 74, 933 N.W.2d 435 (2019). Steffens argues that a mistrial was warranted because "the issuance of protection orders . . . w[as] not relevant to any issue in th[e] case." Brief for appellant at 14-15. He also notes that the court provided no admonition or limiting instruction to the jury, nor could he respond to the testimony. However, as we previously noted, there was no testimony at trial regarding the issuance of the protection orders; rather, the testimony only revealed that Russell and Juhl sought them. And we have already determined that the court did not err in allowing the testimony that Russell and Juhl sought protection orders following the September 17, 2022, incident. We therefore cannot say the court abused its discretion in denying Steffens' motion for mistrial based on the admission of that limited testimony.

### 3. COMPETENCY OF CHILD WITNESS TO TESTIFY

Steffens contends the district court abused its discretion when it found his 8-year-old daughter competent to testify at trial.

The question of competency of a child witness lies within the discretion of the trial court, and that determination will not be disturbed in the absence of an abuse of discretion. *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997). The question as to the competency of a witness must be determined by the court, while the credibility and weight of the testimony are for the jury to determine. *Id.*

While no certain age has been deemed to be the age at which a child becomes competent to testify in a court of law, the trial court generally takes into consideration whether the child is able to receive correct impressions by the senses, to recollect and narrate accurately, and to appreciate the moral duty to tell the truth. See *State v. Earl, supra*.

Steffens argues that the court's competency inquiry revealed that it was not clear his daughter understood her moral duty to tell the truth. He noted that

> [w]hen asked what happens when you tell a lie, K. S. responded "sometimes I get in trouble, sometimes it's good." . . . When asked if she knows the difference between telling the truth and telling a lie, K. S. stated "not really." . . . When asked if she gets in trouble if she tells a lie, K. S. stated "no, not too much."

Brief for appellant at 15-16.

Although Steffens correctly points out that K.S. initially stated that she did not know the difference between telling the truth and a lie, her responses to the district court's continued questioning indicated that she did understand the difference, as indicated in the colloquies set forth previously. She also promised to tell the truth in court. A child witness is not required to be able

to "eloquently define the concepts of lying, the truth, and a promise." *State v. Earl*, 252 Neb. at 132, 560 N.W.2d at 495.

Steffens further argues that his daughter's "ability to accurately recollect and narrate is questionable." Brief for appellant at 16. He claims K.S. did not know her last name because she incorrectly stated that "Russell" was her last name, rather than "Steffens." He further contends that K.S. did not recall in which school district she was enrolled and that she provided inconsistent answers regarding her favorite class. However, these responses were not significant to determining K.S.' competency to testify to the events of September 17, 2022, particularly given the trial court's concession that asking K.S. what school district she attended may have been a "bad question to ask." Further, K.S. was asked what her last name was immediately after being asked what her mother's first name was; it is possible she thought she was being asked what her mother's last name was rather than her own. In fact, the court's next questions asked K.S. for her father's first name and then her father's last name. Regardless, when commencing her testimony before the jury, K.S. stated her "full name for the record," at which time she provided her entire name accurately. Regarding the inconsistency about her favorite class, K.S. specifically recalled stating she did not have a favorite class during her deposition but explained that math had become her favorite class because it had become more fun in the recent weeks.

We cannot say that the district court abused its discretion in determining that K.S. was competent to provide testimony at trial. Further, as argued by the State, even if it was an abuse of discretion to find K.S. competent to testify, any such error was harmless given that K.S.' testimony was merely cumulative to her mother's testimony. See *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017) (where evidence is cumulative and there is other competent evidence to support conviction, improper admission or exclusion of evidence is harmless beyond reasonable doubt).

### 4. MOTION FOR DIRECTED VERDICT AND SUFFICIENCY OF EVIDENCE

Steffens' final two assignments of error will be addressed together. He assigns that the district court erred in denying his motion for directed verdict as to the terroristic threat offense because he contends there was no evidence that Steffens communicated any threat to commit any crime of violence. He argues that since there was insufficient evidence of a terroristic threat, the matter should have been decided as a matter of law and should not have been submitted to the jury.

When a motion for a directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020). In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id*. As we next discuss in our analysis of the sufficiency of the evidence, there is evidence to establish the essential elements of terroristic threats. Therefore, the court did not err in overruling Steffens' motion for a directed verdict after the close of the State's evidence.

As we set forth previously, § 28-311.01(1) provides that "[a] person commits terroristic threats" if they "threaten[] to commit any crime of violence" with the "intent to terrorize another," or with the "intent of causing the evacuation of a building" or in "reckless disregard of the risk of causing such terror or evacuation."

The intent to terrorize another, for purposes of the crime of terroristic threats, is an intent to produce intense fear or anxiety in another. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022). Section 28-311.01 does not require that the recipient of the threat be actually terrorized, and it does not require an intent to execute the threats made. *Id*. A "threat" is commonly understood to mean a promise of punishment, reprisal, or distress. See *State v. Curlile*, 11 Neb. App. 52, 642 N.W.2d 517 (2002). For purposes of § 28-311.01, a threat may be written, oral, physical, or any combination thereof. *Id*. Whether particular conduct constitutes a threat depends on the context of the interaction between the people involved. See *State v. Duckworth*, 29 Neb. App. 27, 950 N.W.2d 650 (2020). A "crime of violence" is an act which injures or abuses through the use of physical force. *State v. Tucker*, 17 Neb. App. 487, 764 N.W.2d 137 (2009).

Steffens argues that the State "failed to provide evidence of the communication of a threat or the intent to terrorize the victim." Brief for appellant at 19. He points out that he "never comment[ed] that he wanted to harm . . . Russell," nor did he indicate "he was going to kill her." *Id*. He further points out that Russell stated that "prior to September 17, 2022, . . . Steffens was never violent nor physically aggressive with her" or their daughter. *Id*.

While it is true that Steffens did not verbally communicate a threat to Russell, the evidence was sufficient for a rational trier of fact to find that Steffens communicated a threat by his actions. Steffens banged on Russell's back door and then her front door before he finally forced the front door open. The door was significantly damaged as a result of the incident. The photographs taken by law enforcement showed that the door was cracked and the latch mechanism was detached from the door. Steffens' physical aggression caused Russell to believe she was "going to die." She was so afraid that he would harm her that she sought a protection order against Steffens. Steffens' actions, at the very least, were done in reckless disregard of the risk of causing terror in Russell.

Further, Russell testified that she was already "on edge" as a result of a phone call which had taken place during the week before the September 17, 2022, incident. In his brief on appeal, Steffens implies that Russell was unreasonably put on edge by the phone call because she indicated she previously had other "odd conversations with . . . Steffens." *Id*. However, whether Russell's anxiety which caused her to lock the doors was rational or not, does not matter. Steffens chose to react by repeatedly banging on Russell's doors, breaking open her front door, and causing Russell to believe she was "going to die." The evidence was sufficient for a jury to determine that Steffens intended to produce intense fear or anxiety in Russell by his actions.

Viewing the evidence in the light most favorable to the State, we find the evidence was sufficient for a rational trier of fact to find the essential elements of the crime of terroristic threats were proven beyond a reasonable doubt.

## VI. CONCLUSION

For the reasons set forth above, we affirm Steffens' convictions.

AFFIRMED.